IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

LAURA HILL,

    Plaintiff,

v.

JAMESTOWN-YORKTOWN
FOUNDATION,

    Defendant.

C.A. No. 4:18-cv-00137-MSD-LRL

## DECLARATION OF ROBERT HOMER LANIER

I, Robert Homer Lanier, declare that the following facts are true to the best of my knowledge and belief:

1. I am presently employed as a Museum Interpretive Program Manager at the Jamestown-Yorktown Foundation ("JYF" or "Foundation"). I have been working in that role since November of 2002. Prior to my current position, I formerly served as the Ships Interpretive Site Supervisor at JYF. As the Museum Interpretive Program Manager, my job duties include, but are not limited to, performance management and supervision of site supervisors and managers; daily program management and program quality oversight; special programs and events planning, support and management; training; budget and resource management; site coordination and communication; and museum duty officer coverage.

2. I make this declaration based on personal knowledge and/or review of records kept in the regular and ordinary course of business.

3. In or around 2011, Laura Hill applied for a position as a part-time historical interpreter at the Foundation. Based on her qualifications, Hill was screened in for an

interview. I sat on her interview panel, and, based on Ms. Hill's interview responses and qualifications, she was hired in the role of part-time historical interpreter.

4. In or around October of 2011, Ms. Hill began working as a part-time, historical interpreter at the Foundation's James Fort site. On or about December 10, 2011, Ms. Cynthia A. Daniel, Interpretive Site Manager, and I met with Ms. Hill to review the testing process she must clear to work in costume at the James Fort site. On or about January 8, 2012, we again met with Hill about her failure to pass the clearing process at the James Fort (as well as other issues regarding her attendance and scheduling). After that meeting, Ms. Hill requested, and was given, a voluntary transfer to a different interpretive site (at the Powhatan Indian Village ("PIV")).

5. On or about July 23, 2013, Ms. Hill came to me with concerns related to unfair or disparate treatment (with possible racial motivation for this treatment) by her supervisor, Ms. Helmick. These allegations centered around an alleged heat-related illness Ms. Hill claimed to have suffered on July 18, 2013 and the response thereto by Ms. Helmick. Ms. Hill raised other concerns to me as well (for example, she alleged that Ms. Daniel and Assistant Site Manager Lara Templin did not thoroughly investigate her allegations as to what happened on July 18, 2013). I thoroughly investigated all of the concerns and other allegations raised by Ms. Hill and, by memorandum dated August 20, 2013, provided her the results of my investigation – which found no unfair or disparate treatment by Ms. Helmick (or others) as alleged by Ms. Hill. A true and accurate copy of my memorandum to Ms. Hill dated August 2013 is attached hereto as Hill Dep., Ex. 17 (JYF 0002726-JYF0002729).

6. On February 21, 2018, Hill failed to show up to work at the scheduled time – having e-mailed her supervisor that she had misread her schedule. As a result, she missed most of a training class that day. Afterwards, Hill was issued a memorandum, dated March

2

15, 2018, which, among other things, suspended her without pay for five (5) shifts and placed her on probation for nine (9) months "in regards to attendance violations." A true and accurate copy of that memorandum, which was signed by me, is attached hereto as Hill Dep., Ex. 21 (JYF 0000140-141).

7. In or around March 2018, JYF advertised for a full-time historical interpreter position. Based on her qualifications, Hill was selected for an interview, along with other qualified candidates. On or about May 7, 2017, Hill interviewed for the position. I sat on the interview panel, along with Jay Templin and Barbra Hoffman. Each candidate was given the same amount of time, and asked the same questions. Based on the candidates' responses, the panel selected four candidates whom we felt gave us the best answers, and hired them for full-time historical interpreter roles.

8. Ms. Hill did not perform well in the interview for the full-time historical interpreter position. The panel concluded that she did not demonstrate a full understanding of the Foundation's Interpreter methodologies, which I noted when I filled out Ms. Hill's non-selection form immediately following the decision. A true and accurate copy of which is attached hereto as Lanier Exhibit A (JYF 000480). The four candidates who were selected were all qualified for the position, and, in the opinion of the panel, gave superior interview answers, which is why they were hired.

9. In September of 2018, Ms. Hill and another JYF employee, Charlotte Price (who was a Caucasian female who had not engaged in any protected activity of which I was aware) were both given a memorandum indicating that JYF needed them to take over presenting general education tours. This reassignment was based on the legitimate business needs of the Foundation, which were outlined in the memorandum. A true and accurate copy of the September 19, 2018 memorandum is attached hereto as Hill Dep., Ex. 44 (JYF

3

000144-145). Although this change meant that Ms. Hill and Ms. Price would no longer be working in costumed roles, their pay remained the same. It also was intended that their amount of hours worked would remain approximately the same as before. Ms. Price has worked in this reassigned role since on or about October 1, 2018 – and continues to do so currently (as of the date of this declaration).

10. On October 16, 2018, Cindy Daniel and I met with Mr. Mark Howell, Director of Museum Education Services, as the Foundation considered what action should be taken in response to Ms. Hill's failure to come to work as scheduled on October 14, 2018. We discussed the incident on October 14, 2018 and Ms. Hill's previous problems with time and attendance issues (including JYF's past efforts to resolve them, and other issues, through corrective action). We also reviewed documentation related to such (by way of illustration, but not limitation, the March 15, 2018 memorandum to Ms. Hill). A true and accurate copy of that memorandum is attached hereto as Hill Dep., Ex. 21 (JYF 000140-141)). In light of the foregoing, I recommended that Ms. Hill's employment be terminated, as I believed the Foundation's past efforts to improve her job performance (and, in particular, her attendance issues) through corrective action had proved unsuccessful. My intent in previously counseling Ms. Hill (as noted herein) was to have her correct the various issues and problems that were raised so that her overall job performance would improve.

11. My actions, beliefs and decisions regarding Ms. Hill, and her employment at the Foundation, were legitimate and work-related. They were not based on Ms. Hill's race or retaliatory - nor were they based, in whole or in part, on any other unlawful motive.

Pursuant to 28 U.S.C. § 1746, I, Robert Homer Lanier, declare under penalty of perjury that the foregoing is true and correct. Executed this February 27, 2020.

_____
Robert Homer Lanier

# MEMORANDUM

DATE: August 20, 2013

TO: Laura Hill

FROM: Homer Lanier

RE: Results of my investigation.


Thank you for allowing me the time to thoroughly take a look into the concerns that you brought to my attention on July 23rd. Your primary concerns were related to unfair or disparate treatment with possible racial motivation for this treatment by your supervisor.

I have met with Jamie Lavin, Cindy Daniel and other staff witnesses. Additionally I have reviewed all meeting notes and email communications relating to your concerns and I have come to the following conclusions which are listed below following your written concerns:

1. On July 18, 2013, my supervisor, Jamie Lavin, did not provide a timely response to my heat-related illness and request to leave work due to my illness; she purposely delayed my departure from work by communicating and falsely representing to me that she could not sign my time card because she was "unofficially at work". I signed out at 3:41 p.m. and she instructed me to wait for Todd Johnson, Duty Officer, or another supervisor to sign my time card. I waited until after 4:00 p.m., she signed my time card approximately 20 minutes after my request.

*After reviewing accounts from all concerned parties, I am unable to determine that your supervisor purposely delayed your departure on the 18th. It was Ms. Lavin's day off and she indicated that she had only stopped by the office with her son to for a brief time and had sent you to the Duty Officer to report that you were leaving early. She contends that she was not initially aware that you were ill and had made an assumption that you were leaving for another reason. An employee leaving work due to sickness is not required to have their timecard signed. Only employees that are asked to work beyond their normal work schedule are asked to obtain a signature for verification that the additional hours were approved by a supervisor.*

2. My supervisor did not respond to my heat-related illness according to the policy she outlined in her memo dated 07/22/13 "Working in the Heat" in which she wrote: "*You do not need to wait to get your time card signed, this can be done later, it is not a requirement for you to leave site.*"; her actions were not consistent with this policy and showed disregard for my health.



JYF 0002726

*Ms. Lavin stated in her email to you on Saturday July 20th, that had she realized that you were sick that she would have responded appropriately and quickly. During my review of this incident, I spoke with several of your co-workers who also stated that they were not aware of your illness when you indicated that you were leaving early.*

3. My supervisor attempted to use her position and my interest in a core level position, which Cindy Daniel had communicated to her earlier on 7/18/13, to manipulate me to return to an unsafe work environment, as the heat index on 7/18/13 was 109 degrees; she responded to my request to leave early, due to my illness, by lecturing me about the requirements of core level employees, such as dependability and needing to work in the heat, and instructed me to go back out on site to continue working without regard for my health and the fact I had communicated to her I was feeling ill. Consequently, I refused to return on-site, indicating to her that "I would not jeopardize my health."

*Based on information available through interviewing of witnesses, I am unable to verify your account of this incident. Ms. Lavin denies this accusation or that a conversation of this nature took place. She stated that she did not order you back out on site.*

4. On July 18, 2013, my supervisor showed disparity in her dealings with me as compared to other employees; she told and represented to me that she was at work "unofficially" and could not sign my time card, while more than 20 minutes later she willingly operated in an "official" capacity by promptly signing time cards for Robin Rose and Martin Saniga, two staff members who had worked late.

*It is understandable that it may seem to be a disparity issue when the details of the other two staff members are not clear. As part of my review of the incident I spoke with the other employees that you referenced as having been treated differently from you. Both stated that Ms. Lavin turned them away to seek out the Duty Officer when they approached her about signing their timecards for having worked extended shifts. She indicated to them that she was not working and would not act in an official capacity on that day.*

5. My supervisor was aware that I was ill; I had communicated this to her as my reason for leaving. However, she did not respond to my illness based on first aid policy outlined in her memo "*Working in the Heat*" or offer any assistance. Her memo states the appropriate response was to "*get victim out of sun. Fan or move victim to air-conditioned room. Apply cool wet cloths.*"

*Discussed above: Ms. Lavin was not acting in an official capacity on this day and was unaware that you were ill.*

6. I deemed my supervisor's response to my email inquiry about how my heat-related illness was handled as disingenuous because she made a false assumption about my reason for leaving early, falsely stated I had not immediately informed her that I was not feeling well, and concealed the truth about her response to my illness.

*I am unable to verify your claim that your supervisor is concealing the truth about her response.*

7. Through these events, my supervisor, Jamie Lavin has demonstrated a pattern of showing disparity in her dealings with me, as compared to other staff members, and I believe her actions could be racially motivated. This pattern began spring, 2012. Consequently, on 2 separate occasions, I have had to meet with her immediate supervisors, as well as their supervisors, to resolve my concerns.

*I am unable to determine an established pattern of your supervisor showing disparity in her dealings with you. Reviewing the conflicting accounts of this incident, together with sparse witness accounts, I can at best determine a breakdown in communication and confusion due to a variety of factors, principally that Ms. Lavin was off that day and not focusing on work related matters as she was engaged with her son after his completion of a Broadside program. In addition, Ms. Lavin's initial lack of understanding that you were feeling ill is also a factor. Ms. Lavin indicates that her response would have been different if you had indicated that you were not simply leaving early.*

8. Site Manager Cindy Daniel and Assistant Site Manager Lara Templin's did not thoroughly investigate my concerns and their responses to me during our meetings on 7/22 and 7/25 led me to believe that they had not examined nor resolved my concerns objectively or fairly, due in part to their long term relationship with my supervisor.

*After reviewing the actions and communications of the responding interpretive site manager and assistant site manager, I find that they carried out their duties appropriately, thoroughly and with reasoned judgment. I cannot substantiate your assertion that Ms. Daniel and Ms. Templin were somehow lacking in the performance of their duties due to the length of tenure of all 3 employees.*

9. Cindy Daniel's decision to and reasons for swiftly re-assigning me to the ship's interpretive site was ill-conceived and could be viewed as punitive towards me for asserting my rights to be treated fairly by my supervisor.

*Ms. Daniel's decision to reassign you to a neighboring site at the same museum which has the identical duties, schedule, and pay in my view is not a punitive action. Rather, it was an attempt to bring about a successful work environment for all concerned parties based upon your assertion that you could not work for Ms. Lavin any longer.*

Additional items-

- You have asserted that your supervisor put you in danger on purpose, has been untruthful, has concealed the truth, and has been insincere. Treated you unfairly and has been disingenuous and racially motivated and that this has been going on for close to a year, even though I have seen you numerous times over the past 10 months and you have only indicated that things were fine and how much you enjoyed your work. Additionally, you stated in an email dated 7/31/13 that "Working under Cindy Daniel, who is the interpretive Site Manager, could be a potentially hostile environment for me, as Ms. Daniel did not respond favorably to my decision to pursue this matter nor explore the possibility that my supervisor's actions were racially motivated." Based on all of your allegations, I have a hard time seeing how you will continue working within Interpretive Services. Additionally you have questioned the integrity and ability of two of our key leaders within interpretive services with unfounded attacks of a personal nature based not on facts, but opinion or conjecture. It is appropriate to question why it appeared you were treated differently than other staff in having your time card signed. However, it is not appropriate to ascribe negative motivations to people without any proof; this is disruptive and undermines the morale in your work area. This behavior must change and will not be tolerated in the future.

- You have offered no proof of the accusations that you have made towards your supervisor, assistant site manager and site manager. What you are asserting is based on conjecture and has not been backed up by witnesses or facts. These accusations amount to unverifiable personal attacks that are of a personal nature which are unfair and offensive to others.

- You have some options to help bring about a successful work site for the future. 1. You can begin your new assignment on the ships for a fresh start. You have asserted that you could not work for Ms. Lavin, so this seemed to be a good option from the departments' viewpoint. 2. You can remain in the PIV, but going forward a different atmosphere of behavior will need to come about.

- On August 12th, you challenged the PIV Watch Officer's authority to assign or approve break times. While this should not have been a public discussion, the fact remains that in following established policy and procedure, according to the Interpretive Site manual Part 8 – pages 1 and 2, it is the Watch Officer's responsibility, in the absence of the supervisor, to manage the number of staff off site at any one time, to ensure that lunches and breaks are administered fairly, and that public programming is delivered as advertised. Moving forward what is needed is a greater level of respect towards your classified watch officers, supervisor and managers. If you can't muster this in the PIV...then I recommend you accept assignment to the ships and start fresh, where the expectations will be the same, or consider moving back to On-site education.

- It is not acceptable for any wage or classified staff member to state to their supervisor that they are recommending that they be retrained. (email 7/19) This is inappropriate and disruptive and/or insubordinate in nature and will not be tolerated in the future.

- I have at a minimum 14 emails from you regarding this matter and subsequent issues that have arisen since your original complaint. I have spent 1.25 hrs on the phone with you reviewing this incident and 2.25 hours meeting with you on this matter. In the future, work related inquiries should be addressed with your Watch Officer or supervisor first, followed by one of the site managers or the Duty Officer

in their absence for resolution, if necessary. This is the chain of command that all staff members should routinely follow and is expected of you.

- I have noticed a pattern of increased allegations lately. Mail box vandalized / act of violence and that we are concealing who has done this, public humiliation by watch officer / supervisor. I find it curious that this pattern began within a month of you being counseled in a meeting by your supervisor on June 18th, 2013 regarding arriving on site at the beginning of your shift and returning from breaks and lunches in a timely manner. Additionally you were counseled about trading shifts with other staff members on too frequent of a basis.

- Ultimately, we value you as a trained member of the interpretive team, and we want this situation to resolve in a way that benefits everyone. You have 3 options available to you to move forward. I look forward to your answer by this Friday, August 23rd.

JYF 0002730

# MEMORANDUM

TO: Laura Hill

FROM: Jamestown-Yorktown Foundation

DATE: March 15, 2018

RE: Attendance

On February 21, 2018, you were scheduled for training at 9:00 a.m. You failed to show up for this training on time. You arrived at approximately 10:00 a.m. and at the end of your training for the day, you emailed your supervisor that you had misread your schedule.

You have been counseled regarding attendance, tardiness, and other issues multiple times and each time you acknowledged the seriousness of these issues and agreed to correct these issues. To date, we have not seen an improvement as demonstrated by this most recent event.

In an effort to impress upon you the seriousness of this situation, the following actions will occur:

1. You will be suspended without pay for five shifts. These shifts were chosen at our discretion based on business needs. You will be suspended for March 15, 16, 17, 19, and 20, 2018. We have covered these shifts and you will not be permitted to work on these dates nor make up these hours. You will be paid only for the time of this meeting today. Your return to work date will be March 22, 2018 on the B6 shift with a start time of 10:00 a.m.

2. You will be placed on a 9-month probation in regards to attendance violations. Any instance tardiness, leaving early without authorization, or unexcused absence in the next 9 months (ending December 15, 2018) will result in immediate termination of your employment with the Foundation. In addition, in accordance with our current no-call/no-show policy, termination will result if there is another no-call/no show at any time.

We are confident you are able to rectify the above issues if you choose to do so. We sincerely hope you choose to correct these issues, and remain a valued employee.

If you have any questions, please do not hesitate to contact me without delay.

A signature page is attached.



JYF 0000140

_____  
Employee Signature

*[signature]*  
_____  
Supervisor Signature

*[signature]*  
_____  
Refusal to Sign Witness Signature

Date

3-15-2018

Date

3-15-2018.

Date


cc: Frank Hardister
    Cindy Daniel
    Barbra Hoffman
    Frank Stovall

## JAMESTOWN-YORKTOWN FOUNDATION

### SELECTION/NON SELECTION FORM

PLEASE COMPLETE THIS FORM FOR EACH APPLICANT INTERVIEWED. Be as specific as possible. DO NOT discuss your decision with any of the candidates. BEFORE A JOB OFFER IS MADE, ALL INTERVIEW RECORDS (APPLICATIONS, QUESTIONS AND ANSWERS AND THIS FORM) MUST BE RETURNED TO THE HR OFFICE FOR REVIEW TO INSURE COMPLIANCE WITH FEDERAL AND STATE GUIDELINES.

Name of Applicant: **Laura Hill**　　　　Position Title: **Museum Historical Interpreter**

Interview Date: May 7th　　Time: 10:30　　Internal Employee? YES ☒　NO ☐

Relative Employed At JYF?　*YES ☐　　NO ☐　　Department: MOE/MES

*A Yes answer is considered only in light of conflict of interest.

███████████████████████████████████████████████████

*APPLICANT INTERVIEWED, MAKE JOB OFFER EFFECTIVE:* _____

**Rationale for selection (check all that apply)**

☐ Possesses sufficient, work related experience, such as: _____

☐ Possesses sufficient educational background

☐ Possesses related knowledge, skills and abilities such as: _____

☐ Holds necessary certificate, such as: _____

☐ Able to work required shift/work hours.　　☐ Other: _____

**Rationale for non-selection (check all that apply)**

☒ Applicant interviewed and not selected but would be our _____ choice (2nd or 3rd only).

☐ Applicant was contacted but was not interviewed for the following reason(s):

　Did not show/canceled interview ☐　　Declined interview ☐　　Accepted another position ☐

☐ Does not possess as much work-related experience as the candidate selected for the position.
　Lacks the following: _____

☒ Does not possess as much work-related knowledge, skills and abilities as the candidate selected for the position.
　Lacks the following: Did not demonstrate full understanding of our entry methodologies.

☐ Does not possess as much educational background as the candidate selected for the position.
　Lacks the following: _____

☐ Does not hold necessary certification, such as: _____

☐ Unable to work required shift/work hours.　　☐ Lack of excellent references.

Interviewer's Signature: _____

Print Name: Homer Lanier　　　　Date: 5-16-18

08/20/02

EXHIBIT
Lanier
A

JYF 0004804

# MEMORANDUM

TO: Laura Hill, Charlotte Price

FROM: Cindy Daniel, Homer Lanier

DATE: September 19, 2018

RE: **<u>Orientation Tours at Jamestown Settlement</u>**

As we mentioned at the after-hours meeting on Monday, beginning October 1, 2018 Interpretive Services will take over presenting general orientation tours from On-Site Education as they turn their attention to booked, structured education tours.

You have been selected to lead this effort due to your tenured status and experience with both Interpretation and On-Site Education, and we feel that your skills best position Interpretive Services to successfully accomplish the following goals:

1. Continuing to provide tours for the general public, especially during the busy school seasons when individuals and families can feel overwhelmed and left out of the outdoor experience.

2. Continuing to provide elements of the recently successful African Cultural Heritage pilot program by including hands-on components from the program in a stop in the Riverfront Discovery Area as part of the tour.

3. While staffing and budget resources will allow limited staff commitment to delivering these tours, we are confident that the two of you, along with current volunteer support of tours, will allow for nearly seven-day-a-week offerings for the visitors.

The orientation tours will be 90 minutes in length, and you will each do three tours a day. There will be two different tour shifts assigned:
- Tour A will work a B55 shift and follow this schedule:
    - 10:00-11:30am       tour
    - 11:30am-12:30pm   lunch
    - 12:30-2:00pm         tour
    - 2:00-2:30pm           break/gallery
    - 2:30-4:00pm           tour



JYF 0000144

- Tour B will work a C55 shift and follow this schedule:
    - 11:00am-12:30pm   tour
    - 12:30-1:30pm      lunch
    - 1:30-3:00pm       tour
    - 3:00-3:30pm       break/gallery
    - 3:30-5:00pm       tour

The tour path will be as follows:

gazebo → village → fort → riverfront → ships

In the event of a split tour (with a volunteer), the path will be:

gazebo → fort → riverfront → ships → village

As stated above, in order to effectively include all three cultures at Jamestown, the Riverfront Discovery Area and its relevant map will be utilized as a stop along the tour again. We are debating the addition of a chest of artifacts on that site for our use, or an artifact bag, as On-Site Education uses. We would value any input you had in this area.

In the event that we have a volunteer who wants to do a tour, and the tour is not large enough to split, defer to the volunteer and let them do the tour. Move to the gallery and interpret to visitors there.

This is a non-costumed interpretive position within Interpretive Services, so please dress professionally (as the GEs do) for the tours, with consideration for the day's weather forecast. As soon as polo shirts for Interpretive Services become available, we will provide you with those, if you would prefer. Cindy Daniel will supervise you, and provide a new position description, monthly scheduling, and regular timesheet submissions. (Homer Lanier will continue to do the same for Randy Flood at Yorktown.)

Thank you in advance for your support of our plan to maximize visitor satisfaction by continuing to provide these valued orientation tours. If you have any questions, please don't hesitate to ask.

Cc: Frank Hardister
    Mark Howell
    Martin Saniga
    Lara Templin