UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

LAURA HILL,

               Plaintiff,

v.                                                Civil No. 4:18cv137

JAMESTOWN-YORKTOWN FOUNDATION,

               Defendant.


## OPINION AND ORDER

In this Title VII action, Plaintiff Laura Hill ("Plaintiff" or "Hill") alleges that her former employer, Defendant Jamestown-Yorktown Foundation ("Defendant" or "JYF"), an educational agency of the Commonwealth of Virginia, unlawfully discriminated against her on the bases of race and religion, retaliated against her for engaging in protected activity, and subjected her to a hostile work environment.  Defendant now moves for summary judgment as to all claims.  ECF No. 37.  Plaintiff opposes Defendant's motion and has filed her own motion for summary judgment as to her religious discrimination claim.  ECF No. 39.

After examining the briefs and the record, the Court determines that a hearing is unnecessary because the facts and legal contentions are adequately presented, and oral argument would not aid in the decisional process.  Fed. R. Civ. P. 78(b);

E.D. Va. Loc. R. 7(J). Defendant's request for a hearing, therefore, is **DENIED**. ECF No. 61. For the reasons stated below, Defendant's motion for summary judgment is **GRANTED**, ECF No. 37, and Plaintiff's motion for partial summary judgment is **DENIED**, ECF No. 39.

## I. FACTUAL BACKGROUND

JYF is an educational agency established by the Commonwealth of Virginia that is "tasked with fostering, through its living-history museums (the Jamestown Settlement and American Revolution Museum at Yorktown) an awareness and understanding of the early history, settlement and development of the United States through the convergence of American Indian, European and African cultures." Def.'s Statement of Undisputed Facts ("DSUF") ¶ 1, ECF No. 38. JYF's facilities are open to the public 7 days a week and 363 days each year. Id. ¶ 2. Plaintiff, an African American woman and a Christian, worked part-time for JYF for a little more than eleven and a half years before her employment was terminated in October of 2018. Plaintiff claims that, throughout her employment with JYF, multiple JYF employees subjected her to racial and religious discrimination, harassment, and retaliation for engaging in protected activity, namely, filing charges of discrimination with the federal Equal Employment Opportunity Commission and various Virginia state agencies ("EEO" charges). Such alleged discriminatory conduct includes: (1) disparate treatment from her

2

supervisors, to include comparatively harsher disciplinary measures and a demotion; (2) failure to hire/promote Plaintiff for multiple positions for which less qualified individuals of a different race than Plaintiff were selected; and (3) failure to accommodate Plaintiff's scheduling requests that she not work on Sundays so that she could attend religious services. ECF No. 15. The Court outlines the most relevant facts below.

## A. Plaintiff's Hiring

Plaintiff was first hired by JYF in March of 2007 as a part-time museum program assistant ("MPA"). DSUF ¶ 3; Pl.'s Statement of Undisputed Facts ("PSUF") ¶ 1, ECF No. 40. In addition to greeting, orienting, and assisting JYF visitors, MPAs lead "interactive structured education tours."[1] DSUF ¶ 4. In October of 2011, JYF hired Plaintiff as a part-time historical interpreter, with Plaintiff also continuing to work part-time as an MPA. Id. ¶ 5; PSUF ¶ 2. Historical interpreters "dress up in period costumes, provide demonstrations and answer questions from the visitors." DSUF ¶ 5. Such employees receive more specialized

---

[1] Plaintiff disputes this fact as "incomplete," ECF No. 50, at 9, but she provides no clarifying information or citation to the record regarding such fact. See Fed. R. Civ. P. 56(c)(1)(A) (requiring a party that is disputing an asserted fact to support such dispute by "citing . . . particular parts of materials in the record"); see also TecSec, Inc. v. Adobe Sys. Inc., 326 F. Supp. 3d 105, 108 (E.D. Va. 2018) ("A party opposing a motion for summary judgment must respond with specific facts, supported by proper documentary evidence, showing that a genuine dispute of material fact exists and that summary judgment should not be granted in favor of the moving party." (emphases added)). As illustrated below, several of Plaintiff's "disputes" provide little to no explanation and/or citation to the record.

training (and more pay per hour) than MPAs, and they must "clear" a testing process prior to "work[ing] in costume at a particular site." Id. As an historical interpreter, Plaintiff was assigned to the James Fort site located at the Jamestown Settlement. Id.

## B. Supervisor Helmick

By April 2012, Plaintiff was reassigned to the Powhatan Indian Village ("PIV") interpretive site to serve as an historical interpreter.[2] Id. ¶ 6; ECF No. 50, at 9. In this position, Plaintiff reported directly to Volunteer Services Manager Jamie Helmick (formerly Lavin), a Native American woman. DSUF ¶ 7. According to Defendant, Ms. Helmick "observed or was made aware of various issues and problems with Hill's job performance," and "[o]n several occasions, Ms. Helmick discussed these issues and problems with Hill and then would provide her a written memorandum afterwards." Id. Ms. Helmick has provided a sworn declaration, which confirms the same and includes copies of examples of the memoranda, which, among other things, indicate that Plaintiff was counseled on the need to arrive on site when her shifts began and

---

[2] The Court notes that there is some dispute between the parties as to what occurred between October of 2011 and April of 2012, with Plaintiff averring that her employment as an historical interpreter (but not as an MPA) was terminated in December of 2011 due to an "economy slowdown," as well as Plaintiff's medical-related absences, and that she was reinstated as an historical interpreter in April of 2012 after complaining that her termination was unfair. ECF No. 50-1, at 73:3-79:22, 83:16-84:22; see DSUF ¶ 6; ECF No. 50, at 9; ECF No. 15, at 5. Such dispute, however, is immaterial as the parties ultimately agree that Plaintiff began working as an historical interpreter at the PIV site in 2012.

to return from breaks in a timely manner, to bring concerns regarding co-workers to her supervisor in a private setting, and to abide by costume requirements.  ECF No. 38-4.  One memorandum from August of 2014 noted that Plaintiff had "called in or arrived to work late on 19 separate days since March," and that such conduct constituted "unsatisfactory work performance and need[ed] to improve immediately."  Id. at 10.

Approximately a year before the August 2014 memorandum, Plaintiff had expressed concerns to Interpretive Program Manager Robert (Homer) Lanier, Ms. Helmick's superior, that Ms. Helmick was subjecting Plaintiff to unfair or disparate treatment, suggesting that such treatment may have been racially motivated. DSUF ¶ 8.  These concerns stemmed from a heat-related illness Plaintiff experienced while working outside on July 18, 2013, and Plaintiff's dissatisfaction with the way in which Ms. Helmick responded to the incident.  Id.  In particular, Plaintiff testified in her deposition that Ms. Helmick waited approximately twenty minutes before agreeing to sign Plaintiff's time card before she could leave work, did not render first-aid to Plaintiff, and told Plaintiff to "go back outside and withstand the heat like your coworkers."  ECF No. 50-1, at 139:9-146:18.

Mr. Lanier investigated Plaintiff's claims regarding the incident—as well as her claims that Interpretive Site Manager Cynthia (Cindy) Daniel and Assistant Site Manager Lara (Karen)

Templin, to whom Plaintiff first reported the incident, did not adequately respond to Plaintiff's concerns—and provided Plaintiff with a detailed memorandum documenting his findings.  DSUF ¶ 8; ECF No. 38-7, at 6-10.  The August 20, 2013 memorandum, which Defendant submitted in connection with Mr. Lanier's declaration, stated that Mr. Lanier had met with Ms. Helmick, Ms. Daniel, and other staff witnesses, and that he was "unable to verify [Plaintiff's] account of this incident," and "at best" could determine only that "a breakdown in communication and confusion due to a variety of factors" were to blame.  ECF No. 38-7, at 6-8.  Mr. Lanier further determined that Ms. Daniel and Ms. Templin responded "appropriately, thoroughly and with reasoned judgment" to Plaintiff's claims.  Id. at 8.  Unsatisfied with the results of the investigation, Plaintiff filed an EEO charge in September 2013 and later received a right to sue letter, but she did not pursue litigation.[3]  ECF No. 50-1, at 163:17-165:6.

### C. Supervisor Hardister

In January of 2015, Ms. Helmick transferred to another interpretive site, and Museum Interpretive Site Manager Frank Hardister became Plaintiff's new supervisor.  DSUF ¶ 9.  According to Defendant, Plaintiff continued exhibiting deficiencies in her

---

[3] In this Court's prior Opinion and Order, the Court dismissed as time-barred any claims of discrimination predicated on discrete acts included in such EEO charge and its amendments, but found that such acts could still be considered in conjunction with Plaintiff's hostile work environment claim. ECF No. 15, at 36-37.

job performance, particularly with respect to appearing on time for her scheduled shifts. For example, on August 15, 2016, Plaintiff "failed to show up for her scheduled shift . . . without calling in beforehand." Id. ¶ 10. JYF refers to such an occurrence as a "no call/no show," and JYF policy provides for termination of an employee that incurs three of these infractions. Id. On August 16, 2017, Plaintiff received her second no call/no show. Id. Defendant has submitted copies of contemporaneous memoranda prepared by JYF representatives documenting both of these infractions. ECF No. 38-3, at 6, 8. Although Plaintiff claims she had legitimate excuses for not calling in/showing up for work on those two days, there is no dispute that Plaintiff did not report to work or call in prior to the start of her shift on either of those days. See ECF No. 50, at 9.

On February 21, 2018, Plaintiff failed to timely report for a scheduled shift, arriving approximately one hour late and thereby missing the first hour of a three-hour training class. DSUF ¶ 11; ECF No. 50, at 10. Plaintiff later emailed Mr. Hardister, explaining that she had misread her schedule. DSUF ¶ 11; ECF No. 50-1, at 186:19-187:11, 199:10-22. As a result, Plaintiff was issued a memorandum, dated March 15, 2018, stating, in part, "You have been counseled regarding attendance, tardiness, and other issues multiple times and each time you acknowledged the seriousness of these issues and agreed to correct [them]. To date,

we have not seen an improvement as demonstrated by this most recent event."  ECF No. 38-7, at 11-12; see also DSUF ¶ 11; ECF No. 50, at 10.   To "impress upon [Plaintiff] the seriousness of this situation," Plaintiff was suspended without pay for five shifts and placed on a nine-month probationary period, during which "[a]ny instance [of] tardiness, leaving early without authorization, or unexcused absence" would "result in immediate termination."[4]  ECF No. 38-7, at 11.  The memorandum separately cautioned that another no call/no show would also result in Plaintiff's termination.  Id.

On April 26, 2018, a little more than a month after receiving the March 15, 2018 memorandum, Plaintiff received a performance evaluation for the period April 1, 2017, to March 31, 2018.  DSUF ¶ 12; ECF No. 50, at 10.   The evaluation, completed by Mr. Hardister with the assistance of Human Resources Manager Barbra Hoffman, rated Plaintiff "Below Contributor," meaning that Plaintiff's performance "failed to meet the Foundation's performance expectations for the evaluation period."[5]  DSUF ¶ 12; ECF No. 38-3, at 2, 11-12.  The evaluation appears to indicate that Plaintiff was satisfactorily performing the duties of an interpreter; however, it expressly noted that Plaintiff "was

---

[4] Plaintiff disputes "as incomplete that Hill was suspended five days and placed on nine months of probation," ECF No. 50, at 10, but provides no further clarifying statements or citation to the record.

[5] The evaluation lists three possible ratings to describe "the level of work performance achieved": Extraordinary Contributor, Contributor, and Below Contributor.  ECF No. 38-3, at 11.

counseled several times this year in regards to her attendance and other issues," and that Plaintiff must demonstrate an improvement in such areas. Id. at 11-12. Among the issues discussed were Plaintiff's high call-in rate, to include thirteen absences, her two prior no call/no shows, and certain costume-related infractions. Id. at 12. The evaluation also highlighted Plaintiff's February 21, 2018 tardiness incident and her resultant probationary period. Id. at 12. The evaluation's closing remarks expressed hope that "improvement in these areas [could] be achieved," opining that Plaintiff had "the potential to be a great interpreter." Id. Nevertheless, JYF indicated that it could not "condone" Plaintiff's "ongoing issues in her performance by providing a 'contributor' rating" on Plaintiff's review. Id.

Though it is somewhat unclear from the record, it appears that Plaintiff complained to JYF management regarding her 2018 performance evaluation, see ECF No. 50, at 10, prompting JYF to issue an addendum to the evaluation on May 1, 2018, which discussed and applauded Plaintiff's work on an "African Culture Heritage Outdoor Interpretive Site" project, which Plaintiff wrote and developed,[6] ECF No. 38-3, at 13; see also ECF No. 50-1, at 35:17-

---

[6] The addendum also noted Plaintiff's objection to a March 5, 2017 incident being included in the 2018 evaluation as such incident was purportedly discussed and resolved in connection with Plaintiff's 2017 performance evaluation, with the addendum explaining that due to the timing of the incident, it was not included in Plaintiff's 2017 written evaluation. ECF No. 38-3, at 13.

37:5; ECF No. 38-6, at 2.  In a May 16, 2018 email to Mr. Hardister, Ms. Daniel, and Ms. Hoffman, Plaintiff acknowledged receipt of the evaluation addendum, but remarked that such curative steps were "too little, too late."  ECF No. 38-3, at 14 (emphasis omitted).  After asserting that the addendum itself contained "omissions" and "inaccurate and misleading information," Plaintiff averred that such deficiencies "were not an oversight" but were part of a deliberate attempt to justify giving Plaintiff a "Below Contributor" rating so as to retaliate against Plaintiff for filing an EEO charge in February 2018, a copy of which Defendant purportedly received on or about April 4, 2018 (approximately three weeks before Plaintiff's evaluation).  Id.; ECF No. 50-2, at 2-4.  Plaintiff stated that she therefore "ha[d] no recourse but to pursue external EEO investigations and legal action."  ECF No. 38-3, at 14.  Plaintiff followed through with her stated intention, amending her February 2018 EEO charge on May 9, 2018, to reflect Plaintiff's claims regarding her 2018 performance evaluation.  ECF No. 50-2, at 5-6.

In July 2018, Plaintiff suffered chest pains and a heat-related illness while working outside.  DSUF ¶ 21.  According to Plaintiff, she was ordered "to perform a cooking demonstration and build[] a fire in the direct sunlight."  ECF No. 50, at 28.  As a result of the incident, Plaintiff filed a complaint with the Virginia Occupational Safety and Health Administration ("VOSH").

10

DSUF ¶ 21.  JYF investigated the incident and provided a "detailed report" to both VOSH and Plaintiff.  Id.  After conducting its own on-site inspection, VOSH "found no violation by JYF" and closed its inquiry.  Id.; ECF No. 38-5, at 34.

### D. Plaintiff's Reassignment

In September of 2018, Plaintiff and JYF employee Charlotte Price (who is Caucasian) both received a memorandum notifying them that, beginning October 1, 2018, Interpretive Services would "take over presenting general orientation tours from On-Site Education" and that, based on Plaintiff and Ms. Price's "tenured status and experience with both Interpretation and On-Site Education," the two of them had been selected to "lead this effort."[7]  ECF No. 38-7, at 14; DSUF ¶ 13.  As a result of this change, Plaintiff would no longer work in a costumed role and would be supervised by Ms. Daniel.  ECF No. 38-7, at 14.  Pointing to the declarations of Ms. Daniel and Mr. Lanier, Defendant asserts that Plaintiff's pay remained the same and that it was intended that the number of hours worked would be approximately the same.  DSUF ¶ 13.

Following notification of the reassignment, Plaintiff sent an email to Ms. Daniel and Mr. Lanier, expressing several concerns and seeking a more detailed explanation as to such business decision.  ECF No. 59-1, at 51-52.  For example, while Plaintiff

---

[7] Plaintiff and Ms. Price were informed of this change in an in-person meeting prior to receiving the memorandum.  ECF No. 38-7, at 14.

explicitly acknowledged that "the title, position and role numbers were the same" between her former position and the new position, and that she had been informed that she would retain "core level status,"[8] she indicated that she considered the reassignment a "demotion" because "the new position involve[d] less skills." ECF No. 59-1, at 51-52. She also asserted that while Ms. Price had purportedly volunteered for the reassignment, Plaintiff—the only African American costumed staff member—had not. Id. at 51-52. Subsequent emails exchanged between Plaintiff and Ms. Daniel reveal that at least some of these questions and concerns were not resolved or addressed in a manner satisfactory to Plaintiff.[9] Id. at 49-50.

### E. Plaintiff's Termination

On October 14, 2018, Plaintiff reported to work one hour earlier than her scheduled shift (10:00 a.m. instead of 11:00 a.m.), a product of misreading her schedule. DSUF ¶ 14; ECF No. 50, at 8. According to Defendant, such mistake "negatively impacted customer service at the Jamestown Settlement – as well as

---

[8] As further discussed below, various materials in the record appear to indicate that historical interpreters fall into one of three categories: seasonal, mid-level, and core, with core-level employees receiving priority over the other two "non-core" categories as to the number of hours worked. See, e.g., ECF No. 38-4, at 3, 5.

[9] The record also includes an email exchange between Ms. Daniel and Ms. Hoffman consisting of a suggested response to Plaintiff's questions/concerns, but it is not immediately apparent whether such response was actually sent to Plaintiff. ECF No. 59-1, at 42.

employee work schedules and other operations thereof." DSUF ¶ 14.

Defendant expounds:

> [T]here was no scheduled tour at 10:00 a.m. on October 14, 2018. Rather, Hill simply rounded up a few visitors who were milling around and created an impromptu tour at that time. That tour consisted of only five (5) people (often a tour would have about 10-15 people). There also was an advertised tour at 11:00 a.m. on October 14, 2018. At 11:10 a.m., when no tour guide showed up, some of the visitors waiting for that tour went back to the lobby asking where the tour guide was and if they should continue to wait for a tour. A historical interpreter had to be pulled from the ships to lead that tour (thus delaying some employee lunches there). In addition, other visitors would have joined the scheduled tour but left when the tour guide was late.

Id. (citation omitted). Ms. Hoffman, the Human Resources Manager, purportedly investigated the incident, arrived at the above findings, and reported them to Director of Museum Education Services Mark Howell on October 15, 2018.[10] Id. ¶ 15. The following day, Mr. Lanier and Ms. Daniel met with Mr. Howell and, in light of Plaintiff's documented "problems with time and attendance issues," recommended that Plaintiff's employment be terminated. Id. Mr. Howell agreed and communicated the same to Senior Director of Museum Operations and Education Peter Armstrong. Id.; see ECF No. 38-5, at 13-14. Mr. Armstrong concurred, and Plaintiff's employment was terminated shortly thereafter on October 23, 2018. DSUF ¶ 15.

---

[10] As discussed below, Plaintiff disputes some of the factual contentions of the incident, but such disputes are ultimately immaterial.

## F. Failure to Hire/Promote

Over the course of Plaintiff's employment with JYF, she applied for various positions within JYF, but she was either not invited for an interview or not selected for the position. For example, in July 2015, March 2016, and April 2017, Plaintiff applied for full-time historical interpreter positions but was not selected for any of them. Id. ¶ 16. As to the latter two non-selections, Plaintiff filed a complaint with the Virginia Office of Equal Employment and Dispute Resolution ("OEEDR"). Id. OEEDR conducted an investigation and "found no violations or discrimination."[11] Id.

In 2018, Plaintiff applied for four more positions but likewise was not selected for any of them. Specifically, in January 2018, Plaintiff applied for a full-time media relations specialist position as well as a part-time assistant curator position. Id. ¶¶ 17-18. With respect to the media relations position, Defendant contends that Plaintiff, who "did not include any work experience with software design applications, design applications, or graphic design applications on her job application," was not granted an interview because Senior Director of Marketing and Retail Operations Susan Bak determined that

---

[11] This Court's prior Opinion and Order dismissed as time-barred any claims that these three non-selections constituted discrete acts of racial discrimination, though such events may still be considered as part of Plaintiff's hostile work environment claim. ECF No. 15, at 27-29.

Plaintiff's "work experience was outdated and/or irrelevant for the position," unlike the candidates selected for interviews and the candidate ultimately selected for the position.[12]   Id. ¶ 17. In response to questions Plaintiff raised regarding her non-selection (including a Freedom of Information Act request), JYF provided, in writing, its justification for denying Plaintiff an interview, with JYF detailing, among other things, the criteria for evaluating the applications, the selection process, the number of applicants (123), the number of applicants selected for an interview (6), and the qualifications/experience of those selected for an interview.   ECF No. 38-5, at 26-28.

As to the part-time assistant curator position, Defendant asserts that Plaintiff was not granted an interview because she did not meet the preferred qualification of having a master's degree, a qualification possessed by each of the applicants

---

[12] The Court notes that Defendant initially cited the declaration of Ms. Hoffman to support the assertion that Ms. Bak determined that Plaintiff's qualifications were unsuited for the position, to which Plaintiff objected. As a result, Defendant submitted the declaration of Ms. Bak in its reply brief for additional support.  Because the Bak declaration relates to factual contentions raised in Defendant's initial motion to which Plaintiff had an adequate opportunity to respond, and did respond, and because the filing of such declaration is essentially "responsive" to Plaintiff's opposition, the Court may properly consider such declaration here.  See DNT, LLC v. Sprint Spectrum, LP, 750 F. Supp. 2d 616, 629-30 (E.D. Va. 2010) (finding that evidence submitted for the first time in a reply brief could be considered by the court where it "specifically relates to issues raised in the initial motion" such that it "do[es] not constitute new evidence that is normally prohibited in a reply brief"); cf. EEOC v. Freeman, 961 F. Supp. 2d 783, 801 (D. Md. 2013).

interviewed, including the applicant actually selected for the position. DSUF ¶ 18.

In March 2018, Plaintiff applied for another full-time historical interpreter position. Id. ¶ 19. Plaintiff was invited to interview and did so in early May 2018 before a three-person panel comprised of Mr. Lanier, Ms. Hoffman, and Interpretive Supervisor Jay Templin. Id.; ECF No. 50-1, at 216:4-11. In the end, however, Plaintiff was not selected for the position. DSUF ¶ 19. According to Defendant, such decision was based on Plaintiff's "poor performance during the interview, and her inability to demonstrate a full understanding of JYF's interpretive methodologies." Id. Following her non-selection, Ms. Hoffman sent Plaintiff an (unsolicited) email on May 14, 2018, "to explain to her specifically where she had come up short in her interview answers," id.; ECF No. 50-1, at 219:6-10, in "an attempt to offer guidance to Ms. Hill to help her improve her interview skills, so that she would have a greater chance of success in future interviews for other full-time positions at JYF." ECF No. 38-5, at 5, 31-33. Ms. Hoffman's email identified a handful of specific questions that were asked of Plaintiff during the interview, described the components of desired responses (i.e., the answers the panel was looking for), and explained in detail

how and why Plaintiff's responses to such questions were lacking.[13] Id. at 31-33.

In responding to Ms. Hoffman's email, Plaintiff stated that while she welcomed constructive feedback, she "did not find [Ms. Hoffman's] feedback constructive because [she] was misquoted and [her] accomplishments were diminished." Id. at 30. After indicating that she "felt rushed" during the interview, Plaintiff went on to overtly suggest that her non-selection had less to do with her interview performance than it did with the notion that JYF "has not been looking for African-American historical interpreters." Id. Plaintiff further stated that she could "not rule out" the possibility that her non-selection stemmed from retaliation "due to the multiple EEO complaints [she had] made regarding racial discrimination and retaliation that are currently under investigation by state and local EEO offices." Id. at 30-31.

Finally, in April 2018, Plaintiff applied for the position of assistant supervisor, a position of higher rank than historical interpreters. DSUF ¶ 20; ECF No. 38, at 20. Plaintiff received an interview, which occurred on May 14, 2018, one week after her interview for the full-time historical position (and just after receiving the feedback email from Ms. Hoffman). DSUF ¶ 20. The

---

[13] During her deposition, Plaintiff claimed, without further elaboration, that "[t]here were discrepancies in the statements that were attributed to [her]." ECF No. 50-1, at 219:1-5.

interview panel consisted of Ms. Hoffman, Mr. Hardister, and Ms. Daniel. Id. Plaintiff was not selected for this position either, with Defendant again averring that "Hill did not interview well, and did not demonstrate a full understanding of JYF's interpretive methodologies." Id.

## G. Failure to Accommodate Religious Practices

When Plaintiff first began working as an historical interpreter in 2011, she signed a "Wage Position Description/Performance Plan," wherein she acknowledged and agreed that she would "[w]ork 4-6 weekend days/holidays per month." DSUF ¶ 22; ECF No. 38-1, at 76. In her deposition, Plaintiff acknowledged that "[a] weekend date can be a Saturday or a Sunday," and that when she first interviewed for the part-time historical interpreter position in 2011, she was told that "there were some weekend dates that were required." ECF No. 50-1, at 234:5-16.

As a Christian, Plaintiff preferred not to work on Sundays so that she could attend religious gatherings with her family, and Plaintiff testified that, prior to 2016, JYF regularly granted Plaintiff's requests not to work on Sundays. ECF No. 50-1, at 236:6-9. In March 2016, however, Plaintiff was required to sign another Wage Position Description/Performance Plan, which, according to Plaintiff, contained a "new policy requiring staff to work on Sundays." PSUF ¶ 5. Specifically, the document stated that the signatory would be required to "[w]ork[] 4-6 weekend

18

days/holidays per month as scheduled, <u>including assigned Sundays</u>."
ECF No. 40-3, at 2 (emphasis added).  Regarding this requirement,
Plaintiff penned on the document the following qualifier: "with
accommodations for religious services as requested."  <u>Id.</u>
Assistant Interpretive Supervisor Templin, however, limited
Plaintiff's qualifying language by adding the following: "as
possible due to necessity of scheduling."  <u>Id.</u>; ECF No. 38-3, at
3.  Both Plaintiff and Ms. Templin initialed the hand-written
notations, and Plaintiff signed the document.  ECF No. 40-3, at 2-
3.

According to Plaintiff, at some point in 2017, Mr. Hardister
informed Plaintiff that "each employee must work at least one
Sunday a month," and that if an employee did not provide work
availability for at least one Sunday per month, Mr. Hardister would
randomly select a Sunday for that employee.[14]  PSUF ¶¶ 7-8; ECF No.
50-1, at 245:16-18.  Consequently, Plaintiff would provide
availability for at least one Sunday each month and would often be

---

[14] JYF employees could request not to be scheduled for certain days by
indicating those days on an employee-shared "wish list," a calendar printout
for the upcoming month made available approximately a month prior to the
issuance of the final schedule for that upcoming month.  To make such a
request, an employee would simply mark an "X" in a box corresponding to the
particular day(s) on which the employee would prefer not to be scheduled.
Whether such requests were granted, however, depended on JYF's scheduling
and operational needs, in addition to other business considerations.  Mr.
Hardister explains such wish lists in greater detail in his declarations.
ECF No. 38-3, at 4; ECF No. 49-3, at 1-2.

scheduled to work on such days, although she would have preferred to have those days off.  PSUF ¶¶ 14, 24, 28.

Plaintiff asserts that the one-Sunday-per-month policy was not uniformly enforced, claiming, for example, that one of her co-workers, Anastasia Triantafillos, "requested every Sunday off and her requests were approved."  PSUF ¶ 10; ECF No. 50-1, at 251:22-252:4.  The same was purportedly true for another co-worker, Russell Reed, who, for instance, requested and received every Sunday off in November 2017.  PSUF ¶¶ 11, 14; ECF No. 50-1, at 248:15-21; ECF No. 45-1, at 16; ECF No. 38-3, at 21.  But whenever Plaintiff requested every Sunday off, she "was told [she] was being denied because no employee gets every Sunday off."  PSUF ¶ 14; ECF No. 50-1, at 246:2-4.  Instead, in order to get out of working an assigned Sunday shift, Plaintiff was required to find another co-worker to cover her shift, a task that Mr. Reed and Ms. Triantafillos were allegedly never required to undertake.  PSUF ¶ 23; ECF No. 50-1, at 258:3-21.  Moreover, on at least one occasion, Plaintiff was allegedly reprimanded for switching shifts with another employee.  PSUF ¶ 32.

Plaintiff also claims that several of her requests to work a different Sunday shift were denied.  By way of example, Plaintiff was scheduled to work on Sunday, February 18, 2018, from 10:00 a.m. to 4:45 p.m.  Id. ¶ 19.  Plaintiff emailed Mr. Hardister on February 15, 2018, requesting to be reassigned to the 1:00 p.m. to

20

5:00 p.m. shift (the "E" shift or "E4" shift), but Mr. Hardister denied her request. Id. ¶¶ 19, 22. Additionally, Plaintiff was scheduled to work on at least one Sunday (September 16, 2018) that she had requested off on the September 2018 wish list—a day that three other staff members were purportedly available to work yet were not scheduled. Id. ¶ 31.

Perceiving a "disparity," Plaintiff testified that she emailed Mr. Hardister, seeking an explanation. ECF No. 50-1, at 270:11-19. Although not cited in Plaintiff's brief, it appears that Plaintiff is referring to a May 19, 2018 email found in Exhibit D to her motion. ECF No. 40-4, at 12. In that email, after pointing out that: (1) Mr. Reed requested and was granted every Sunday off in November of 2017 and was also not scheduled to work any Sunday in February of 2018; and (2) Ms. Triantafillos requested off every Sunday but one for the months March, April, and May 2018 and was not scheduled to work any Sunday in those three months, Plaintiff inquired as to why "some staff members [had] been excluded from adhering to" the one-Sunday-per-month requirement. Id. Plaintiff testified that Mr. Hardister's response "did not provide a plausible explanation." ECF No. 50-1, at 270:20-271:9.

In a later email responding to Plaintiff's questions and concerns, a copy of which Defendant has produced, compare ECF No. 38-3, at 21-23, with ECF No. 40-4, at 12, Mr. Hardister verified

21

that Mr. Reed did not work any Sundays in November 2017 (a month in which Mr. Reed requested every Sunday off) or February 2018 (a month in which Mr. Reed requested only one Sunday off), but Mr. Hardister went on to explain that Mr. Reed "was also assisting with covering other shifts and was working 5 and 6 days in a row including Saturdays" in November and "up to 5 days in a row including Saturdays" in February. ECF No. 38-3, at 21-22.

As to Ms. Triantafillos, Mr. Hardister indicated that while she was previously a core-level employee like Plaintiff, Ms. Triantafillos moved to "non-core" status in June of 2017 and thus was "not required to work the same number of Sundays as core wage employees as she works fewer days in total," with Mr. Hardister further noting that Ms. Triantafillos had worked only 11 days in March 2018, 10 days in April 2018, and 12 days in May 2018, compared to the 16-18 days that core level staff members worked during the same period. Id. at 22; see also ECF No. 40-4, at 15 (stating that Ms. Triantafillos' "required availability is for temporary coverage only" and that "[s]he is not required to provide the same availability as core wage interpreters").

In the end, therefore, Mr. Hardister disclaimed the notion that "some staff members [were] excluded from adhering to" the Sunday availability requirement,[15] and concluded by stating, "If

---

[15] For additional support, Mr. Hardister provided in his email a chart listing: (1) all employees that held core status for any period of time between January 2017 and May 2018; (2) the number of Sundays worked by each

you would like to reduce your hours to non-core wage staff, up to 10 days per month, instead of your current schedule, please let us know." ECF No. 38-3, at 22-23.

## H. Harassment – Hostile Work Environment

While most of Plaintiff's claims of workplace harassment relate to incidents already discussed (e.g., 2013 and 2018 heat-related illness incidents, 2018 performance evaluation, non-selections for promotions, Sunday scheduling, suspension/probation, reassignment, and termination), Plaintiff also identifies a few other incidents of alleged harassment that she claims contributed to creating a hostile work environment. In August 2017, for example, Plaintiff was counseled about damaging her costume and entering the costume shop after hours. See ECF No. 38-3, at 12; ECF No. 38-5, at 23; ECF No. 50-1, at 298:5-16; ECF No. 58-1, at 3. In October 2017, Plaintiff was issued a written warning and counseled for wearing acrylic French nail tips while in costume, as well as for insubordination for not removing the nail tips until several days after being told to remove them.

---

employee while in core status during that period; and (3) the number of months each employee did not work any Sundays in a particular month while in core status during that period. ECF No. 38-3, at 22. The chart revealed that for such period, Plaintiff held core status for seventeen months and worked a total of nineteen Sundays, an average of just over one Sunday per month; Mr. Reed held core status for nine months and worked a total of eighteen Sundays, an average of two Sundays per month; and Ms. Triantafillos held core status for five months and worked a total of five Sundays, an average of one Sunday per month. Id. During the same period, Plaintiff worked no Sundays in three separate months, and Mr. Reed and Ms. Triantafillos worked no Sundays in two separate months. Id.

ECF No. 38-1, at 112-13; ECF No. 38-3, at 12; ECF No. 50-1, at 280:17-284:1.   Plaintiff asserts, without any record citation, that such incidents were "grossly exaggerated and did not violate JYF's policies."  ECF No. 50, at 19.

Plaintiff also claims that she was harassed while teaching a class on tobacco growing in 2018.   According to Plaintiff, Assistant Supervisor Martin Saniga, a Native American, "appeared unannounced and unregistered . . . and disrupted the class, and made comments about Ms. Hill's course material."  ECF No. 50, at 7; accord ECF No. 15, at 19.   Plaintiff reported Mr. Saniga's "disruptive" behavior, ECF No. 59-1, at 36-37, "yet no action was taken against Mr. Saniga," ECF No. 50, at 7; see ECF No. 38-5, at 35-36.

## II. PROCEDURAL HISTORY

Plaintiff filed suit against Defendant on October 26, 2018, alleging five counts of employment discrimination: Count I – discrimination on the basis of race in violation of Title VII; Count II – retaliation for engaging in protected activity in violation of Title VII; Count III – hostile work environment based on race, religion, and retaliation in violation of Title VII; Count IV – discrimination based on religion in violation of Title VII; and Count V – discrimination based on age in violation of the Age Discrimination in Employment Act ("ADEA").  ECF No. 1.  Plaintiff

filed an amended complaint on December 6, 2018, alleging the same statutory violations but adding more factual detail.   ECF No. 4.

On February 5, 2019, Defendant filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). ECF No. 7.   In a written Opinion and Order dated July 15, 2019, the Court granted in part and denied in part Defendant's motion, dismissing Plaintiff's ADEA claim as well as any discrimination claims based on discrete acts that were not timely asserted in Plaintiff's EEO charges or in federal court.   ECF No. 14. Plaintiff filed a second amended complaint—the operative complaint—on July 30, 2019, which asserts the same claims in Counts I through IV of the previous complaints.   ECF No. 15.

On April 30, 2020, the parties filed the instant cross motions for summary judgment.[16]   Defendant's motion seeks summary judgment as to all claims, ECF No. 37, whereas Plaintiff's motion seeks summary judgment only as to her religious discrimination claim (Count IV), ECF No. 39.   Both motions are fully briefed and thus ripe for review.

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that a district court shall grant summary judgment in favor of a movant if such

---

[16] Trial in this matter was originally set for April of 2020.   Following a two-month stay of the case, however, trial was continued to June of this year in light of delays caused by the ongoing COVID-19 pandemic.   Notably, civil jury trials were suspended District-wide from the spring of 2020 through May of 2021.

party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The mere existence of some alleged factual dispute between the parties "will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby Inc., 477 U.S. 242, 247–48 (1986).  "A genuine question of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party."  Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012).

Although the initial burden on summary judgment falls on the moving party, once a movant properly submits evidence supporting summary judgment, the non-moving party may not rest upon the mere allegations of the pleadings, but instead must set forth specific facts in the form of exhibits and sworn statements illustrating a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322–24 (1986).  "Because '[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge,'" the Court must only evaluate the evidence to the extent necessary to determine whether there is "sufficient disagreement to require submission to a jury or whether [the evidence] is so one-sided that one party must prevail as a matter of law."  McAirlaids, Inc.

v. Kimberly-Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (alteration in original) (quoting Anderson, 477 U.S. at 251-52, 255).   In making its determination, "the district court must view the evidence in the light most favorable to the nonmoving party." Jacobs v. N.C. Admin. Off. of the Cts., 780 F.3d 562, 568 (4th Cir. 2015) (internal quotation marks omitted).

When faced with cross-motions for summary judgment, each motion must be considered "separately on its own merits to determine whether either of the parties deserves judgment as a matter of law," and "all factual disputes and any competing, rational inferences" must be resolved "in the light most favorable to the party opposing that motion."   Defs. of Wildlife v. N.C. Dep't of Transp., 762 F.3d 374, 392 (4th Cir. 2014) (internal quotation marks omitted).

## IV. DISCUSSION

### A. Counts I and IV: Discrimination Based on Race and Religion

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [or] religion."   42 U.S.C. § 2000e-2(a).

### 1. Race

"Absent direct evidence, the elements of a prima facie case of [race] discrimination under Title VII are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." Coleman v. Md. Ct. of Appeals, 626 F.3d 187, 190 (4th Cir. 2010); see also Holland v. Wash. Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007). Upon a prima facie showing, pursuant to the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), "the burden of production then shifts to the employer to articulate a non-discriminatory . . . reason for the adverse action." Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216 (4th Cir. 2016). Assuming the employer makes such a showing, "the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory." Id. An employee may accomplish this "by showing that the employer's proffered explanation is unworthy of credence." Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 256 (1981).

### a. Suspension/Probation and Termination

In seeking summary judgment, Defendant argues that Plaintiff fails to establish the second and fourth elements of a prima facie

case with respect to her suspension/probation and termination. The Court agrees.

Regarding the second element, given the current record before the Court, Plaintiff cannot demonstrate that she was performing her job satisfactorily at the time she was disciplined and terminated. Indeed, the incontrovertible evidence demonstrates that, leading up to the adverse employment actions, Plaintiff had a documented history of attendance and timeliness issues across multiple years and multiple supervisors. See ECF No. 38-1, at 91-93; ECF No. 38-3, at 6-9, 12; ECF No. 38-4, at 9-11; ECF No. 38-7, at 11. After Plaintiff reported to work late on February 21, 2018, by which time she had already accrued two no call/no shows, Plaintiff received a memorandum indicating that she had been "counseled regarding attendance [and] tardiness . . . multiple times," and though Plaintiff had "acknowledged the seriousness of these issues and agreed to correct" them, JYF had "not seen an improvement." ECF No. 38-7, at 11. Accordingly, as reflected in the March 15, 2018 memorandum, Plaintiff was suspended without pay for five shifts and placed on a nine-month period of probation. Id. She was plainly warned that any future "instance [of] tardiness . . . or unexcused absence" during that nine-month period would "result in immediate termination." Id. Nonetheless, on October 14, 2018, Plaintiff, having again misread her schedule, reported to work an hour early, which ultimately resulted in her

failing to appear to lead a scheduled tour.[17]  In accordance with
the terms of Plaintiff's probation, her employment was terminated.
Such evidence, which Plaintiff fails to rebut with other evidence
in the record, totally undermines Plaintiff's ability to
demonstrate that her job performance was satisfactory.  See TecSec,
Inc., 326 F. Supp. 3d at 108.

Plaintiff appears to argue that considerations of timeliness
and attendance do not, or should not, factor into assessing whether
one's job performance is satisfactory.  See ECF No. 50, at 14 ("The
suggestion that her job performance was not satisfactory is almost
laughable.  More importantly, Ms. Hill was not terminated because
of an allegation that her job performance was poor but because of
a time an[d] attendance issue.").  Plaintiff instead focuses on
her work developing the African Cultural Heritage pilot program in
2017 and 2018 and how well it was apparently received by JYF
leadership, stating broadly that her job performance "far exceeded
other historical interpreters."  Id. at 13-14.

---

[17] Although Plaintiff disputes some of the factual contentions of the October
14, 2018 incident "as being false and lacking any citation to the record,"
with Plaintiff noting that at least some of the assertions are based on the
declaration of Ms. Hoffman, the Human Resources Manager, "who was not
present," ECF No. 50, at 10-11, Plaintiff nonetheless acknowledges that she
arrived to work an hour early on October 14, 2018, that her leading a non-
scheduled tour at 10:00 a.m. resulted in her "failure to be at the tour
location at [11:00 a.m.]," id. at 10, and that such action "caused an
inconvenience" in that another interpreter had to lead the 11:00 a.m. tour,
with the start of such tour being delayed as a result, ECF No. 50-1, at
293:21-295:9.

Despite Plaintiff's attempt to excise considerations of timeliness and attendance from the calculus, it cannot seriously be contested that such factors are integral to the overall measure of an employee's job performance.  <u>See, e.g.</u>, <u>Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.</u>, 31 F.3d 209, 213 (4th Cir. 1994) ("[A] regular and reliable level of attendance is a necessary element of most jobs.").  Indeed, as Plaintiff herself testified, "attendance is important in any position," as is "coming to work as scheduled on time."  ECF No. 50-1, at 188:6-22.  Accordingly, whatever the success of the African Cultural Heritage pilot program that Plaintiff developed, such fact does not detract from Plaintiff's repeated attendance and timeliness infractions, which, unrebutted, are sufficient to defeat any claim that Plaintiff was performing her job satisfactorily.[18]  <u>See</u> <u>Karpel v. Inova Health Sys. Servs.</u>, 134 F.3d 1222, 1228 (4th Cir. 1998) (finding that the plaintiff's job performance was unsatisfactory where the record demonstrated, among other things, that she was "repeatedly tardy"); <u>Cowan v. Glenbrook Sec. Servs., Inc.</u>, 123 F.3d 438, 445 (7th Cir. 1997) (holding that the plaintiff could not demonstrate satisfactory job performance where he was "chronically late"); <u>Stephens v. State</u>

---

[18] To the extent Plaintiff argues that her performance was nonetheless satisfactory in light of the fact that "several employees made the same occasional errors" with respect to attendance and timeliness, ECF No. 50, at 15, such argument will not avail Plaintiff.  Indeed, that other JYF employees also exhibited issues with attendance and timeliness does not in any way give Plaintiff a passing grade for her own shortcomings with respect to those same issues.  <u>See</u> <u>Karpel</u>, 134 F.3d at 1228.

31

Univ. of N.Y. at Buffalo, 11 F. Supp. 2d 242, 248 (W.D.N.Y. 1998) ("[S]everal courts have held that excessive tardiness, or sporadic and unpredictable attendance, is sufficient to render an employee's job performance unsatisfactory."). Accordingly, Plaintiff fails to establish a prima facie claim of racial discrimination with respect to her suspension/probation and termination.[19]

Although the Court need not go further given that Plaintiff fails the second element of a prima facie racial discrimination claim, the Court agrees with Defendant that Plaintiff also fails to point to evidence capable of establishing the fourth element (disparate treatment). In support of this element, Plaintiff argues that the decisions to suspend her, put her on probation, and terminate her were unduly harsh. For example, with respect to the February 21, 2018 tardiness incident and the associated memorandum, Plaintiff argues that JYF's threatening Plaintiff with "termination for any infraction" was a "more severe penalty than any employee at JYF had received for a one hour late arrival." ECF No. 50, at 10. Plaintiff cites attached copies of approximately twenty counseling memoranda generated by JYF on various dates between 2015 and 2017 and addressed to other JYF

---

[19] Because the Court finds that the unrebutted evidence of Plaintiff's repeated attendance and timeliness issues alone is sufficient to render Plaintiff's job performance unsatisfactory, the Court need not consider Defendant's claims that Plaintiff's job performance was also unsatisfactory in other respects.

employees/former JYF employees, whose names have been redacted, involving such employees' poor work attendance and/or timeliness.[20] ECF No. 59-1, at 61-89. Notably, such materials were initially submitted by Defendant to support its claim that "other employees outside of Hill's protected class were in fact counseled and/or disciplined (and also terminated) for not coming to work on time and/or not calling in." ECF No. 38, at 14-15; see ECF No. 38-5, at 7, 37-65.

At the outset, JYF's threat of termination in the March 15, 2018 memorandum was not, as Defendant asserts, predicated on a single one-hour-late tardy. As the memorandum indicates on its face, Plaintiff was placed on probation in light of her history of attendance and tardiness issues and her failure to correct them, despite having been counseled "multiple times" regarding such issues and having "acknowledged the[ir] seriousness." ECF No. 38-7, at 11. Furthermore, Plaintiff's citation to the various counseling memoranda involving other JYF employees is insufficient to carry her burden to demonstrate that she was treated differently than members outside of her class because citation to such documents alone fails to establish that the involved employees were "similarly situated to [her]self in all relevant respects." Odom v. Int'l Paper Co., 652 F. Supp. 2d 671, 692 (E.D. Va. 2009).

---

[20] The cited documents also consist of a number of associated internal JYF emails, a termination letter, an interim evaluation form, and a written notice.

Indeed, such a showing requires Plaintiff to provide evidence that the putative similarly situated employees "dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Haywood v. Locke, 387 F. App'x 355, 359 (4th Cir. 2010) (unpublished per curiam) (alteration in original) (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)). Here, however, Plaintiff has not shown that any of those employees' attendance and timeliness issues spanned as long a period as Plaintiff's (which were first documented as early as 2013 and persisted in 2014, 2016, 2017, and 2018), nor has she shown that any of those employees were ever supervised by Mr. Hardister (Plaintiff's supervisor at the time she was suspended and put on probation) or Ms. Daniel (Plaintiff's supervisor at the time she was terminated). See also ECF No. 55-3, at 2-3. Accordingly, Plaintiff also fails to establish the fourth element of a prima facie racial discrimination claim.

Furthermore, even if Plaintiff could establish a prima facie case, Defendant has presented legitimate, non-discriminatory reasons for terminating Plaintiff, namely, attendance/timeliness infractions, and Plaintiff's attempts to show that such reasons are pretextual do not comport with the evidentiary record. For example, Plaintiff argues that JYF violated its own policy in

34

firing Plaintiff.  Specifically, Plaintiff claims that an employee is terminated for violating the no-call/no-show policy only after that employee has incurred three such infractions.  Plaintiff claims, however, that she "was not a no-call/no[-]show on three occasions, so by JYF's own policies, she should not have been terminated for violating the no-call/no-show policy."  ECF No. 50, at 17.  Thus, Plaintiff argues, JYF's violation of its own policy with respect to the number of no-call/no-shows required before resorting to termination "raises an inference of pretext."  Id. (citing Lathram v. Snow, 336 F.3d 1085, 1093 (D.C. Cir. 2003)).

The record is clear, however, that JYF did not consider Plaintiff's October 14, 2018 infraction a no-call/no-show and did not terminate her pursuant to that policy.  Rather, JYF terminated Plaintiff based on an "unexcused absence" that occurred during Plaintiff's period of probation—an entirely separate basis for termination.  ECF No. 38-6, at 5-6; see also ECF No. 38-7, at 11 (stating that "[a]ny instance [of] tardiness, leaving early without authorization, or unexcused absence in the next 9 months . . . will result in immediate termination," and stating separately that another no-call/no-show at any time would also result in termination).  Consequently, Plaintiff's argument in this regard fails.  Plaintiff's other conclusory claims of pretext likewise find no support in the record and are wholly without merit.  See, e.g., ECF No. 50, at 20 (asserting, without any

citation to the record or further elaboration, that evidence of pretext is illustrated by the fact that "the reasons for the disciplinary actions are false"). The Court, therefore, **GRANTS** Defendant's motion for summary judgment with respect to Plaintiff's claim that her suspension/term of probation and termination constituted racial discrimination in violation of Title VII.[21]

### b. Reassignment

Plaintiff also contends that her reassignment in October 2018 was racially discriminatory. Defendant, however, argues that Plaintiff's evidence is insufficient to demonstrate that such reassignment constituted an adverse employment action. ECF No. 38, at 16-17. "An adverse employment action is a discriminatory act which adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment." James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004) (alteration in original) (internal quotation marks omitted). Ordinarily, to prove an adverse employment action based on a reassignment of position, a plaintiff must demonstrate that such reassignment carried with it a "decrease in compensation, job title, level of responsibility, or opportunity for promotion." Boone v. Goldin, 178 F.3d 253,

---

[21] For these same reasons, to the extent Plaintiff claims that she was subjected to discrete acts of racial discrimination in connection with any of the associated reprimands she received, the Court **GRANTS** Defendant's motion for summary judgment as to such acts.

256-57 (4th Cir. 1999).  It will not do to simply claim that the new position resulted in increased difficulty or stress.  Id. at 256-57; see also Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 762 (1998) (stating that an adverse, "tangible employment action in most cases inflicts direct economic harm").

After careful review of the record, the Court agrees with Defendant that Plaintiff fails to present sufficient evidence for a reasonable jury to conclude that her October 2018 reassignment constituted an adverse employment action.  First, there is no genuine dispute that Plaintiff's pay was unaffected by the reassignment.  ECF No. 38-2, at 2-3; ECF No. 38-7, at 3-4.  Second, Plaintiff's claim that her hours were reduced lacks evidentiary support.  In making such assertion, Plaintiff cites an email that she sent to Ms. Daniel on October 18, 2018, wherein Plaintiff asserts that two other "core level staff interpreters in the Indian Village[] were scheduled to work an[] average of approximately 133 hours in October, 2018, while [she] was scheduled to work 104.5 hours," and that "core-level interpreters in the 4 other interpretive sites were also scheduled significantly more hours." ECF No. 59-1, at 49.

Critically, however, even if it were true that other employees worked more hours than Plaintiff in October 2018, such fact does not prove or even suggest that Plaintiff personally experienced a reduction in hours after she was reassigned.  In opposing

Defendant's motion for summary judgment, Plaintiff cites no evidence of the number of hours she worked per week/month prior to the reassignment and the number of hours she worked per week/month after the reassignment. Further still, Defendant has submitted declarations from Ms. Daniel and Mr. Lanier that the number of hours Plaintiff was expected to work in the new position would be approximately the same number of hours she worked prior to the reassignment.[22] ECF No. 38-2, at 2-3; ECF No. 38-7, at 3-4. Similarly, Plaintiff cites no evidence suggesting that her reassignment resulted in a decrease in the level of responsibility or the opportunity for promotion. Although, as Defendant readily admits, Plaintiff would no longer perform a costumed role, Plaintiff has not pointed to facts suggesting why/how such change amounts to a "reassignment with significantly different responsibilities," Ellerth, 524 U.S. at 762, particularly where, as Plaintiff acknowledged, the primary function of the new position (i.e., leading tours) was already a duty carried out by Plaintiff in her previous position, see ECF No. 38-7, at 14, ECF No. 59-1,

---

[22] Although initially submitted in connection with opposing Plaintiff's motion for partial summary judgment, Defendant has also provided evidence that the number of hours Plaintiff actually worked in October 2018 prior to her termination was commensurate with her desired number of hours. ECF No. 49, at 16-17, 25-26; ECF No. 49-5, at 2, 4-6. Defendant also includes such evidence in its reply brief regarding its own motion. ECF No. 55, at 14-15. The Court need not rely on such evidence here, however, as the burden ultimately falls on Plaintiff, and Plaintiff has cited no evidence corroborating her conclusory assertion in her opposition brief that her hours were reduced when she was reassigned.

at 51; see also Thorn v. Sebelius, 766 F. Supp. 2d 585, 599 (D. Md. 2011) (stating that in order to constitute an adverse employment action, a change in duties must be "so weighty as effectively to change [the] basic terms of employment"). Rather, Plaintiff cites her dissatisfaction with the reassignment and her subjective belief, as expressed in an email to Mr. Lanier and Ms. Daniel, that it amounted to a "demotion." "The mere fact that a new job assignment is less appealing to the employee, however, does not constitute adverse employment action." James, 368 F.3d at 375. Consequently, Plaintiff's characterization of her reassignment as a "demotion" finds no support in the record.

Absent any other proof, simply citing the fact that Plaintiff expressed concerns and raised questions regarding her reassignment, which may or may not have been addressed prior to her termination, is insufficient to raise a genuine dispute as to whether the reassignment constituted an adverse employment action, particularly where Defendant has provided unrebutted evidence indicating the opposite is true. See McAirlaids, Inc., 756 F.3d at 310 (stating that summary judgment is appropriate where the evidence "is so one-sided that one party must prevail as a matter of law").

Furthermore, even if Plaintiff could point to evidence sufficient to make out a prima facie case, Plaintiff has not revealed anything in the record suggesting that her reassignment

was for any purpose other than what was conveyed to her in writing: beginning in October 2018, Interpretive Services would be "tak[ing] over presenting general orientation tours from On-Site Education" and Plaintiff's "tenured status and experience with both Interpretation and On-Site Education" made her an ideal candidate to "lead this effort." ECF No. 38-7, at 14.

Collectively considering the above, Defendant's motion for summary judgment is **GRANTED** as to Plaintiff's claim that her reassignment constituted racial discrimination in violation of Title VII.

### c. Failure to Hire/Promote

Defendant next seeks summary judgment as to Plaintiff's claims that her non-selections for various positions at JYF in 2018 constituted racial discrimination, namely, the media relations specialist position, the assistant curator position, the historical interpreter position, and the assistant supervisor position.   Assuming a plaintiff lacks direct proof of discrimination in failing to hire or promote, she may demonstrate a prima facie case by establishing the following elements: "(1) [s]he is a member of a protected group; (2) [s]he applied for the position in question; (3) [s]he was qualified for the position; and (4) [s]he was rejected for the position under circumstances giving rise to an inference of unlawful discrimination." Brown v. McLean, 159 F.3d 898, 902 (4th Cir. 1998).   Where the position

sought was filled, the final element "is most easily satisfied by showing that someone outside of the plaintiff's protected group ultimately was selected for the position." Langerman v. Thompson, 155 F Supp. 2d 490, 495 (D. Md. 2001).

Here, Plaintiff argues that she has direct proof of racial discrimination with respect to her non-selections and thus need not establish a prima facie case. ECF No. 50, at 22-23. Such "proof," however, consists of nothing more than pure conjecture. For example, without any citation to the record, Plaintiff claims in her opposition brief:

> Regardless of her job performance and the position Ms. Hill applied for, JYF, and the behavior of its human resources manager, Barbra Hoffman, has made it clear to Ms. Hill that under no circumstances would she be offered a full time position. The record reveals that Ms. Hoffman was working behind the scenes to bring charges against Ms. Hill to cause her termination, and inserting herself on interview panels to disrupt Ms. Hill's interview and to ensure that Ms. Hill was never selected for a full time position.

Id. at 22. Plaintiff further contends that "JYF's treatment of Ms. Hill was consistent with how it treated all African American applicants and employees. Less than 10% of the Agency's employees were African American, and of the African Americans who were employed by JYF, 75% of the full time African American employees (14) worked as grounds keepers and custodians." Id. Next, Plaintiff points to an email that she sent to Ms. Hoffman following her non-selection for the historical interpreter position in May

41

2018, in which Plaintiff essentially accuses JYF of not wanting to hire African American full-time historical interpreters.  Id. at 22-23.

The Court has little difficulty concluding that such unfounded accusations and irrelevant data do not, as Plaintiff contends, constitute direct proof of discrimination with respect to Plaintiff's non-selections.  In order to proceed on this claim, therefore, Plaintiff must establish a prima facie case.  As to the first two positions, for which Plaintiff did not receive interviews, Defendant argues that Plaintiff cannot make such a showing because she cannot demonstrate that she was qualified for such positions.  As to the other two positions, Defendant appears to concede that Plaintiff can make out a prima facie case, but claims that she cannot show that Defendant's asserted justifications for Plaintiff's non-selection for such positions were pretextual.

### i. Media Relations Specialist Position

As to the media relations specialist position, Defendant's evidence demonstrates that Plaintiff was not selected for an interview because it was determined that her application was outdated and/or irrelevant for the position, unlike the individuals selected to interview, to include the individual ultimately selected for the position.  ECF No. 55-2, at 2. According to Plaintiff, however, "[t]he evidence reveals that

42

Defendant minimized Plaintiff's strengths by changing the criteria for interviewing candidates." ECF No. 50, at 24; see ECF No. 50-1, at 206:10-207:15 (asserting that the criteria identified by JYF in evaluating candidates differed from that identified in the job announcement, and that the "new" criteria "eliminated" those areas that played to Plaintiff's strengths and added areas of skill/experience "not indicated" in Plaintiff's application materials, creating the "perception" that JYF deliberately thwarted Plaintiff's chances). Once again, such assertion comes with no citation to the record; and Plaintiff's conclusory deposition testimony on this point is uncorroborated by any record evidence. See TecSec, Inc., 326 F. Supp. 3d at 108 (stating that a party opposing summary judgment "must respond with specific facts, supported by proper documentary evidence, showing that a genuine dispute of material fact exists" (emphasis added)).

Nevertheless, even if the Court were to assume that Plaintiff had the requisite qualifications for the position, Plaintiff fails to put forth any evidence that would permit a reasonable jury to conclude that JYF's asserted non-discriminatory reason for not granting Plaintiff an interview was pretextual. The evidence is irrefutable that each of the handful of candidates selected to interview for the position (out of a pool of 123 applicants) was clearly qualified for the position, with several years' experience in the relevant field. ECF No. 38-5, at 27. In her deposition,

Plaintiff contended that her "qualifications were consistent . . .
if not stronger than these applicants, some of these applicants."
ECF No. 50-1, at 212:10-15.  Although Plaintiff appears to have a
degree in mass communications/journalism, one of the preferred
degrees for the position, Plaintiff provides no evidence to support
her claim that her qualifications matched or bested those selected
to interview for the position such that she was deserving of an
interview.  Consequently, Plaintiff's claim that her non-selection
for the media relations specialist position was a product of racial
discrimination must be rejected at the summary judgment stage.
See Moore v. Mukasey, 305 F. App'x 111, 116 (4th Cir. 2008)
(unpublished per curiam) (holding that a Title VII plaintiff could
not "rely on his qualifications to establish pretext because he
has not presented evidence that would allow a reasonable jury to
conclude that he was better qualified than" the individual hired);
Rachelson v. Sec'y of Health & Hum. Servs., 834 F. Supp. 879, 886
(D. Md. 1993) (rejecting discrimination claim where the plaintiff
asserted that the successful candidate was "less qualified" than
him but "offer[ed] no evidence to support his contention of
discrimination other than the fact that he was not chosen for this
position and a woman was").

### ii. Assistant Curator Position

Plaintiff's claim of discrimination with respect to the part-
time assistant curator position is easily disposed of.  First,

44

there is no dispute that one of the preferred qualifications for such position was that the applicant have a master's degree, a qualification that Plaintiff did not possess, ECF No. 50-1, at 203:1. There is also no dispute that each of the candidates selected to interview for the position, including the candidate that ultimately received the position, had a master's degree. ECF No. 38-5, at 4. Even to the extent that Plaintiff was otherwise qualified for the position, Plaintiff makes no credible showing that the candidates selected for an interview were less qualified for the position than she was so as to permit a reasonable jury to infer that the stated reason for her non-selection was pretextual. While Plaintiff claimed in her deposition that "there have been multiple times when Caucasian candidates . . . did not have the preferred qualifications" and "not only were they interviewed . . . they were hired as well," ECF No. 50-1, at 203:1-7, such broad and totally unsubstantiated claim does not suffice to create a genuine dispute of material fact.

### iii. Historical Interpreter and Assistant Supervisor Positions

As previously stated, Defendant appears to concede that Plaintiff can make out a prima facie case with respect to the two positions for which Plaintiff received interviews but was not selected. However, Defendant argues that it has set forth legitimate, non-discriminatory justifications as to why Plaintiff was not selected for those positions and that Plaintiff cannot

45

point to any evidence suggesting that such justifications are pretextual. The Court agrees.

Beginning with the historical interpreter non-selection, JYF contends that Plaintiff was not hired for such position because she interviewed poorly and did not demonstrate a full understanding of JYF's interpretive methodologies. DSUF ¶ 19; ECF No. 38-5, at 5; ECF No. 38-7, at 3. As explained above, following the non-selection, Ms. Hoffman sent Plaintiff an <u>unsolicited</u> email "to explain to her specifically where she had come up short in her interview answers," DSUF ¶ 19; ECF No. 50-1, at 219:6-10, in "an attempt to offer guidance to Ms. Hill to help her improve her interview skills, so that she would have a greater chance of success in future interviews for other full-time positions at JYF." ECF No. 38-5, at 5. In particular, Ms. Hoffman highlighted certain aspects of Plaintiff's answers that the interview panel deemed inadequate. <u>Id.</u> at 31-33.

In an attempt to create a genuine dispute on this particular non-selection, Plaintiff cites her previous assertions in an email to Ms. Hoffman that she "was misquoted and [her] accomplishments were diminished" and that she "felt rushed" during the interview, and she further claims that the individual that received the position, Russell Reed, was "being groomed for the position long before the interview." ECF No. 50, at 22-26. Such allegations,

which find no evidentiary support in the record, do not suffice at the summary judgment stage.

In not selecting Plaintiff for the assistant supervisor position, JYF again asserts that Plaintiff did not interview well and failed to demonstrate a full understanding of JYF's interpretive methodologies, with Defendant citing declarations that provide specific deficiencies in some of Plaintiff's interview responses. DSUF ¶ 20; ECF No. 38-3, at 2-3; ECF No. 38-5, at 6. Plaintiff scarcely addresses this non-selection in her brief, with Plaintiff simply citing the response she provided regarding her non-selection for the full-time historical interpreter position, and short of providing any specific facts or citing any materials in the record, it is clear that no reasonable jury could return a finding that JYF's asserted non-discriminatory justification for Plaintiff's non-selection as to this position was pretextual.

Consequently, each of Plaintiff's claims of discrimination in failing to hire/promote is without merit. The Court, therefore, **GRANTS** Defendant's motion as to Plaintiff's claims of discrimination for failure to promote/hire.

After reviewing the record as a whole, and for the reasons stated above, the Court is left with the firm conviction that no reasonable jury could return a verdict for Plaintiff as to any of her racial discrimination claims. See Dulaney, 673 F.3d at 330.

47

Accordingly, Defendant's motion for summary judgment is **GRANTED** as to Count I.

## 2. Religion

Establishing a prima facie claim of discrimination for failure to provide a religious accommodation requires a plaintiff to show that: "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; [and] (3) he or she was disciplined for failure to comply with the conflicting employment requirement." Chalmers v. Tulon Co. of Richmond, 101 F.3d 1012, 1019 (4th Cir. 1996). If the plaintiff can make such a showing, the burden shifts to the employer to demonstrate that "it could not accommodate the plaintiff's religious needs without undue hardship." Id. As the Fourth Circuit has explained, "[t]his is a two-prong inquiry. To satisfy its burden, the employer must demonstrate either (1) that it provided the plaintiff with a reasonable accommodation for his or her religious observances or (2) that such accommodation was not provided because it would have caused an undue hardship—that is, it would have result[ed] in more than a de minimis cost to the employer." E.E.O.C. v. Firestone Fibers & Textiles Co., 515 F.3d 307, 312 (4th Cir. 2008) (internal quotation marks omitted). Critically, the employer is under no obligation to provide the employee with "his or her preferred accommodation," but only a reasonable accommodation. Id. at 312-

48

13.  If an employer has done this much, "the statutory inquiry is at an end" and liability will not attach.  Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 68 (1986).

In seeking summary judgment on this claim, Defendant begins with the backdrop that, notwithstanding Plaintiff's claim that she requested a religious accommodation not to work on Sundays (an assertion for which Plaintiff cites an EEO charge that she filed in September 2018),[23] the record, including Plaintiff's own sworn testimony, reveals that Plaintiff never expressed a total unwillingness to work on Sundays.  ECF No. 49, at 6-7; see, e.g., ECF No. 50-1, 257:19-21 (Plaintiff testifying that she "consistently requested an E4 shift from [1:00 p.m.] to [5:00 p.m.]" on Sundays "so that [she] could attend religious services in the mornings"); ECF No. 40-4, at 2 (Plaintiff stating in an email to Mr. Hardister that she was "willing to work periodically

---

[23] Throughout both her brief opposing Defendant's motion for summary judgment and her brief in support of her own motion for partial summary judgment, Plaintiff repeatedly supports factual assertions by citation to the various EEO charges she filed against JYF.  Plaintiff's allegations in those charges, however, are just that—allegations—and similar to Plaintiff's inability to rely on allegations in the complaint at the summary judgment stage, see Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991), she cannot rely on allegations in an EEO charge as substantive evidence at the summary judgment stage.  Additionally, the EEO allegations amount to inadmissible hearsay and thus offer no valid evidentiary support.  See Hicks v. Ferreyra, 396 F. Supp. 3d 564, 572 (D. Md. 2019).  This latter point is illustrated by the fact that, at the final pretrial conference in this case, the Magistrate Judge sustained Defendant's hearsay objection to Plaintiff's attempt to use the allegations in the EEO charges as substantive proof of discrimination, noting that only the fact that Plaintiff filed such charges would be admissible.  ECF No. 69, at 4.

on Sundays to insure there is sufficient coverage"); *see also* ECF No. 40-3, at 2-3.[24]

Ultimately, however, Defendant argues that, even assuming Plaintiff can demonstrate a prima facie case of failure to accommodate (a point that Defendant does not concede), Defendant provided Plaintiff with a reasonable accommodation in that Plaintiff was permitted to voluntarily swap Sunday shifts with her co-workers. ECF No. 38, at 27-29. The Court agrees that, irrespective of Plaintiff's ability to make out a prima facie claim, Defendant indisputably provided Plaintiff with a reasonable accommodation. The Court, therefore, **GRANTS** Defendant's motion for summary judgment on that basis.

An employer meets its Title VII obligation to reasonably accommodate an employee's religious practices where the employer permits the employee to voluntarily swap shifts with other employees so as to resolve a conflict between the employee's work obligations and his or her religious practices. Firestone Fibers & Textiles Co., 515 F.3d at 315-16; Abdelkader v. Sears, Roebuck & Co., 780 F. Supp. 2d 389, 394 (D. Md. 2011); Sanchez-Rodriguez v. AT&T Wireless, 728 F. Supp. 2d 31, 42-43 (D.P.R. 2010); see also 29 C.F.R. § 1605.2(d)(1)(i). Importantly, however, it is

---

[24] Additionally, Defendant has provided a copy of a questionnaire regarding Plaintiff's 2018 application for the full-time historical interpreter position, in which she indicated that she was able to meet the requirement that she "work weekends and/or holidays, up to 4 Sundays per month." ECF No. 49-5, at 2, 10.

incumbent on the employee to take a proactive role in availing herself of such accommodation, such as by securing her replacement and taking other necessary steps to facilitate the swap. See Firestone Fibers & Textiles Co., 515 F.3d at 316 (stating that an employee's failure to take advantage of voluntary shift swaps did "not render the accommodation any less significant in the reasonableness calculus"); E.E.O.C. v. Thompson Contracting, Grading, Paving, & Utils., Inc., 793 F. Supp. 2d 738, 745 (E.D.N.C. 2011) ("An employee cannot blame his employer for not successfully accommodating him, when he himself makes no effort to find accommodations on his own."). Moreover, that an employee is ultimately unsuccessful in finding another employee willing to swap shifts does not render the accommodation unreasonable. See Miller v. Drennon, 966 F.2d 1443, 1992 WL 137578, at *3 (4th Cir. June 19, 1992) (unpublished table decision); Sanchez-Rodriguez, 728 F. Supp. 2d at 42-43.

Here, Plaintiff testified during her deposition that JYF provided her with the option of switching shifts with other willing and available employees:

> Q And that was an option that was provided to you, correct? If you were scheduled to work on a Sunday or any other shift, you were given the opportunity to switch out, correct?
>
> A Yes, if someone was available.

ECF No. 50-1, at 258:8-11.  Consistent with such testimony, the record includes additional evidence that Plaintiff was given the ability to switch all or part of her shift with other employees, see ECF No. 38-1, at 107, 110; ECF No. 38-3, at 4; ECF No. 40-4, at 5-7; ECF No. 50-1, at 267:9-268:3, and in fact did so from time to time, including on some of the Sundays that she complains about in her motion, see ECF No. 49, at 14; ECF No. 49-5, at 2, 7-9.

Plaintiff attempts to undermine this evidence by pointing out that she was issued a written reprimand on September 17, 2018, for switching shifts with another employee the day prior.  PSUF ¶ 32; ECF No. 40, at 14-15.  While such reprimand stated that Mr. Hardister was "concerned" about Plaintiff's "switching of shifts and scheduled days," it is clear from the face of the document that such concern stemmed not from Plaintiff's desire to have Sundays off, but from the fact that "many of [Plaintiff's] scheduling conflicts [were] occurring well after the schedule ha[d] been published."  ECF No. 40-9, at 2.  The memorandum further informed Plaintiff that, to the extent that she needed to swap shifts with another employee, it was her "responsibility to find coverage for [her] shift, not [her] supervisor's," noting that Plaintiff's recent request that Mr. Hardister reach out to another employee to inquire as to whether such employee would swap a Sunday shift with Plaintiff would be "unfair" to that other employee given

that he may feel that he could not refuse such a request from a supervisor.  Id. at 3; see ECF No. 38-1, at 110.

Mr. Hardister's stated concern with the late timing of Plaintiff's requests for shift changes is borne out by other evidence in the record showing that Plaintiff sometimes made such requests just a few days before the start of the scheduled shift, well after the final schedule had been issued.[25]  See ECF No. 38-3, at 4; ECF No. 45-1, at 11-12 (requesting shift change three days prior to start of shift, and renewing request one day prior to start of such shift); ECF No. 40-4, at 6 (requesting shift change two days prior to start of shift), 7 (requesting shift change three days prior to start of shift), 8 (requesting shift change four days prior to start of shift).  Consequently, to the extent Plaintiff claims that she did not receive a reasonable accommodation because she was reprimanded for swapping shifts, such claim is belied by the record and does not preclude summary judgment.  Further still, Plaintiff does not allege, much less provide any evidence, that she was reprimanded or otherwise prevented from swapping shifts with another employee on any other occasion.  In fact, for some of the Sundays that Plaintiff complains in her brief about being scheduled to work, she does not

---

[25] Mr. Hardister's declaration indicates that the final schedule for a particular month would be "issued, and posted, around the 25th day of the prior month."  ECF No. 38-3, at 1.

even allege that she attempted to swap such shifts with another employee. See PSUF ¶¶ 24, 28.

In this Court's view, the statutory inquiry ends based on this collective evidence. See Philbrook, 479 U.S. at 68. Plaintiff, however, argues otherwise, citing her claims that two other employees, Mr. Reed and Ms. Triantafillos, received every requested Sunday off. Such claims, to the extent they are relevant to whether Plaintiff received a reasonable accommodation, are unavailing. Regarding Ms. Triantafillos, Defendant has provided evidence that beginning in June of 2017, she was no longer a core-level employee and thus did not have the same scheduling availability requirements as Plaintiff, a core-level employee. ECF No. 38-3, at 3, 21-22. Plaintiff's dispute of this fact in her brief is unaccompanied by a citation to the record, see ECF No. 50, at 12, and she testified in her deposition only that it was her "understanding" that core-level and mid-level employees alike were required to "work one Sunday a month," ECF No. 50-1, at 266:21-267:6.[26] Furthermore, pointing to a single occurrence of another core-level employee requesting and receiving every Sunday off in a particular month, as Mr. Reed did in November of 2017, does not, in this Court's view, convert the issue of whether

---

[26] Plaintiff referenced a "memo" that purportedly announced such requirement and was circulated among JYF staff, to include Ms. Triantafillos, ECF No. 50-1, at 267:6-8, but Plaintiff has not produced such memo.

Plaintiff received a reasonable accommodation into a question for the jury given the indisputable evidence already discussed.[27]

Because the uncontroverted record evidence establishes that JYF provided Plaintiff with a reasonable accommodation, the Court finds that Defendant is entitled to summary judgment with respect to Plaintiff's claim of religious discrimination for failure to accommodate. Accordingly, the Court **GRANTS** Defendant's motion to that effect and thus **DENIES** Plaintiff's motion for partial summary judgment.[28]

### B. Count II: Retaliation

Title VII also prohibits an employer from "discriminat[ing] against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title

---

[27] The same holds true even when considering that Mr. Reed was not scheduled to work any Sundays in February 2018, a month in which he requested only one Sunday off. Moreover, as indicated in footnote 15, there is unrebutted evidence in the record that, from January 2017 to May 2018, Plaintiff worked, on average, nearly one Sunday per month less than Mr. Reed.

[28] Count IV appears to also allege religious discrimination on the basis of disparate treatment, at least in the title/heading of such count. ECF No. 15, at 33. A claim of religious discrimination based on disparate treatment is a theory of liability distinct from a failure to accommodate theory and consists of the same prima facie elements required for a racial discrimination claim. See Chalmers, 101 F.3d at 1017. However, aside from a few cursory references, the parties devote no discussion to such theory in their briefs for either of the motions for summary judgment, which may stem from the fact that the second amended complaint itself does not appear to include any specific allegations regarding a claim of religious discrimination based on disparate treatment. That said, Defendant moves for summary judgment on such claim, and because Plaintiff points to no "direct or indirect evidence whose cumulative probative force supports a reasonable inference that [the] discharge [or any other adverse employment action] was [religiously] discriminatory," id. (first alteration in original) (quoting Lawrence v. Mars, Inc., 955 F.2d 902, 905–06 (4th Cir. 1992), the Court also **GRANTS** Defendant's motion in that respect.

VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII.  42 U.S.C. § 2000e-3.

Unless a plaintiff provides direct evidence of retaliation, a prima facie case consists of three elements: "(1) engagement in a protected activity; (2) adverse employment action;[29] and (3) a causal link between the protected activity and the employment action."  Coleman, 626 F.3d at 190.  As with claims of discrimination under § 2000e-2(a), if a prima facie case is established, under the McDonnell Douglas framework, the burden "shifts to the employer to articulate a non-retaliatory reason for the adverse action."  Guessous, 828 F.3d at 216.  If the employer does so, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true, but-for reason is retaliatory.  Id.; see Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 252 (4th Cir. 2015) ("[T]he McDonnell Douglas framework has long demanded proof at the pretext stage that

---

[29] Importantly, the "adverse employment action" necessary to prove a retaliation claim does not require the same species of "adverse employment action" necessary to establish a disparate treatment claim.  Rather, a retaliation claim requires proof that an employer undertook "a materially adverse action . . . [by doing] something that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Smith v. Clark/Smoot/Russell, 796 F.3d 424, 434 (4th Cir. 2015) (internal quotation marks omitted)); see also Wilson v. City of Chesapeake, 290 F. Supp. 3d 444, 462 (E.D. Va. 2018) ("In the context of a retaliation claim, the standard for a materially adverse action is lower than that for a . . . disparate treatment claim.").

retaliation was a but-for cause of a challenged adverse employment action."). As explained by the Fourth Circuit, "[i]f a plaintiff can show that she was fired under suspicious circumstances and that her employer lied about its reasons for firing her, the factfinder may infer that the employer's undisclosed retaliatory animus was the actual cause of her termination." <u>Foster</u>, 787 F.3d at 250 (citing <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 148 (2000)).

Upon a review of the summary judgment record, the Court concludes that Plaintiff's claims of retaliation lack merit. In opposing Defendant's motion, Plaintiff identifies only two incidents of alleged retaliation. The first is her 2018 performance evaluation. According to Plaintiff, such evaluation was completed just three weeks after JYF received a copy of an EEO charge that Plaintiff filed, which accused JYF of racial discrimination and retaliation. ECF No. 50, at 26; ECF No. 50-2, at 2-4. Purportedly in response to such charge, JYF "deliberately omitted Ms. Hill's major accomplishment," namely, her work on the African Cultural Heritage pilot program, from her written evaluation so as to create a "false narrative" regarding Plaintiff's job performance, "justify a low rating," and "facilitate termination." ECF No. 50, at 26.

The record, however, refutes such claim. First, accepting the apparent temporal proximity of JYF's purported receipt of the

EEO charge, Plaintiff has identified no adverse action as a result of her 2018 performance evaluation, much less one stemming from the omission of her work on the African Cultural Heritage project, the alleged retaliatory act.  See James, 368 F.3d at 377 (holding that "a poor performance evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment" (internal quotation marks omitted)).  In fact, after Plaintiff complained about the omission of her work on that program, JYF issued an addendum to the evaluation including such information and congratulating Plaintiff on her accomplishment. ECF No. 38-3, at 13.  Furthermore, when Plaintiff was terminated approximately six months later, such decision was based on her "unexcused absence" from a scheduled tour on October 14, 2018, in conjunction with her probation, which began the previous March.[30] Accordingly, any claim by Plaintiff that her 2018 performance evaluation constituted unlawful retaliation is insufficient to create a jury issue.

The second and final incident of alleged retaliation that Plaintiff raises in her brief is the fact of her termination, which she argues was in retaliation for protesting her October 2018

---

[30] Although the 2018 evaluation included the fact of Plaintiff's attendance/timeliness issues and resultant term of probation—an inclusion that Plaintiff does not claim was retaliatory or otherwise improper—there is no indication in the record that any adverse action was taken in response to such information simply being repeated in the evaluation.

"demotion."  The Court need not devote much time to this claim as Plaintiff again does not point to any evidence that would permit a reasonable jury to conclude that her termination resulted from unlawful retaliation, whether for Plaintiff's protesting her "demotion" or for any other protected activity that Plaintiff engaged in.  In other words, Plaintiff fails to show that JYF's proffered explanation for her termination is "unworthy of credence."  Burdine, 450 U.S. at 256; see also Milligan-Grimstad v. Stanley, 877 F.3d 705, 711 (7th Cir. 2017) (stating that "suspicious timing [of an employee's termination] alone is rarely enough to survive summary judgment particularly when there are reasonable, non-suspicious explanations for the time of [the] termination" (alteration in original) (internal quotation marks omitted)).

Plaintiff's second amended complaint alleges other purportedly retaliatory acts, including, for example, her non-selections, her reassignment, and the denials of her requests to not be scheduled to work on Sundays.  See ECF No. 15, at 31. Plaintiff does not address these claims in her brief, and, in any event, nothing in the record evidence supports such claims.

In light of the foregoing, Defendant's motion for summary judgment is **GRANTED** with respect to Count II.

## C. Count III: Hostile Work Environment

Defendant also seeks summary judgment on Plaintiff's hostile work environment claim.  A plaintiff may prove a violation of Title VII by demonstrating that they were subjected to a "hostile work environment."  Unlike discrete acts of discrimination, a "hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002) (internal quotation marks omitted); see also Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015) (en banc) (stating that "viable hostile work environment claims often involve repeated conduct" (emphasis added)).  To prevail on a hostile work environment claim, as relevant here, a plaintiff must show: (1) "unwelcome conduct"; (2) based on the plaintiff's race/religion; (3) that is "sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment"; and (4) that is imputable to the employer.  Boyer-Liberto, 786 F.3d at 277 (internal quotation marks omitted).

Here, Defendant seems to argue that Plaintiff cannot demonstrate the second, third, or fourth elements.  ECF No. 38, at 25-27.  The Court agrees as to the second and third elements and does not discuss the fourth.

As an initial matter, most of the incidents that Plaintiff characterizes as "harassment" are the same incidents that this Court has already addressed, with the Court noting an absence of evidence/inferences that could support a finding of a discriminatory motivation, such as Plaintiff's non-selection for various positions, her suspension/probation, her reassignment, and her termination.  Plaintiff's remaining purported incidents of harassment include her reprimands for costume-related infractions, her pre-2018 non-selections, Mr. Saniga's "disruption" of her class in 2018, the 2013 and 2018 heat-related illness incidents, and her 2018 performance evaluation.

With respect to the second element, Plaintiff has failed to present any evidence, aside from her own speculation, that such actions were based on Plaintiff's race, religion, or engagement in protected activity.  Indeed, Plaintiff has provided no proof of a single racially or religiously insulting comment or an offensive remark in response to Plaintiff's participation in protected activity, or any similarly related physical intimidation, directed at Plaintiff by any JYF employee.  See, e.g., E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306, 314 (4th Cir. 2008) (finding that a reasonable jury could determine that workplace harassment was religiously based where evidence demonstrated that the plaintiff, a Muslim, was repeatedly called "Taliban" and "towel head," teased about his appearance, and harassed about his short prayer sessions

during work hours); Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 191 (4th Cir. 2004) (finding that complained of "hostility" toward the plaintiff was not actionable in a hostile work environment claim where, among other things, the plaintiff conceded that "no one in the . . . workplace used racial epithets, racially derogatory terms, or demeaning racial characteristics, or stereotypes with respect to him or any other persons, in his presence"); Qaiser v. SBA, No. 1:15cv1627, 2016 WL 8711622, at *10 (E.D. Va. Mar. 18, 2016) ("[T]he type of conduct necessary to state a hostile work environment claim [based on race] involves racially offensive remarks or other overt racially insulting conduct."). Accordingly, Plaintiff fails the second element based on the absence of evidence, or reasonable inferences, "linking" the alleged hostility to any of the protected classes she identifies.

Moreover, even if Plaintiff could point to evidence suggesting that the identified occurrences of harassment were based on one of Plaintiff's protected statuses, Plaintiff nonetheless fails to demonstrate that such incidents, even when considered in combination, were sufficiently severe or pervasive to alter the conditions of her employment and to create an objectively abusive work environment. See Strothers v. City of Laurel, 895 F.3d 317, 331 (4th Cir. 2018) (stating that the third prima facie element of a hostile work environment claim consists of "both a subjective and objective component, i.e., the employee

must both personally and <u>reasonably</u> believe that the conduct rises to the level of a hostile environment" (emphasis added)). The Court arrives at such conclusion after examining "the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Id.</u> (internal quotation marks omitted). Simply put, the events that Plaintiff identifies as purportedly creating a hostile work environment fall well short of creating a jury issue as to whether her workplace was objectively so "permeated with discriminatory intimidation, ridicule, and insult" as to amount to a hostile work environment.[31]  <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993); <u>see, e.g.</u>, <u>Well v. Gates</u>, 336 F. App'x 378, 387-88 (4th Cir. 2009) (unpublished per curiam) (affirming award of summary judgment to the defendant on hostile work environment claim predicated on retaliatory conduct where the plaintiff "fail[ed] to demonstrate that the alleged harassment was objectively hostile and abusive"); <u>Sunbelt Rentals, Inc.</u>, 521 F.3d at 314-317 (finding that a reasonable jury could determine that harassment was sufficiently severe or pervasive to support claim of hostile work environment where evidence demonstrated that the plaintiff was

---

[31] In light of these findings, the Court does not reach Defendant's alternative argument that such incidents of harassment are not imputable to JYF.

repeatedly subjected to offensive and disparaging comments based on his religion).

In light of Plaintiff's failure to produce evidence sufficient to warrant a jury's consideration of her hostile work environment claim, the Court **GRANTS** Defendant's motion for summary judgment as to Count III.

## V. CONCLUSION

For the reasons set forth above, Defendant's request for a hearing is **DENIED**. ECF No. 61. Defendant's motion for summary judgment is **GRANTED**, ECF No. 37, and Plaintiff's motion for partial summary judgment is **DENIED**, ECF No. 39.

The Clerk is **DIRECTED** to send a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

_____/s/_____

Mark S. Davis
CHIEF UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
May  26 , 2021